933 So.2d 134 (2006)
STATE of Louisiana
v.
Jack J. CUCCIA.
No. 2005-KA-0807.
Court of Appeal of Louisiana, Fourth Circuit.
March 15, 2006.
*141 Eddie J. Jordan, Jr., District Attorney, Meri M. Hartley, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Joseph P. Raspanti, Metairie, LA, for Defendant/Appellant.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge DENNIS R. BAGNERIS SR., Judge MICHAEL E. KIRBY).
MICHAEL E. KIRBY, Judge.

STATEMENT OF THE CASE
Defendant Jack J. Cuccia was charged by bill of information on August 5, 2003 with manslaughter, a violation of La. R.S. 14:31. He pleaded not guilty at his August 19, 2003 arraignment. On July 7, 2004, the trial court denied in part and granted in part his motion in limine. On August 27, 2005, defendant was found guilty as charged after a four-day trial by a twelve-person jury. On October 15, 2004, he filed motions for arrest of judgment and for release of juror information. At some point prior to December 13, 2004, defendant filed motions for judgment notwithstanding the verdict and for new trial. On January 13, 2005, the trial court denied the motions for new trial, for arrest of judgment and for release of juror information. On that date the trial court also sentenced him to twenty-five years at hard labor without benefit of parole, probation or suspension of sentence. On March 3, 2005, defendant was adjudicated a third-felony habitual offender; after defendant waived all legal delays, the trial court vacated its original sentence and resentenced defendant to thirty years at hard labor. On that date the trial court also denied defendant's motion to reconsider sentence and granted his motion for appeal.
Defendant was convicted of manslaughter for killing Lucy Ceperiano, a/k/a Lucy Poret, who died on May 5, 2003 as a result of blunt force trauma to the head. Defendant admittedly struck Lucy in her head with an object during a struggle at defendant's residence when Lucy was allegedly attempting to steal drugs from him and jewelry belonging to his mother. Ceperiano was treated at a hospital and checked herself out in less than twenty-four hours. She returned later that day in a coma. Defendant contended that another individual, Steve Mernin, with whom Lucy was living at the time she died, had battered Lucy after she left the hospital and that this subsequent injury was the cause of her death.

FACTS:
Lillian Gittelson, the victim's sister, testified that Lucy Ceperiano struggled with drug addiction. She mentioned that Lucy used cocaine and had used heroin in the past. She confirmed on cross examination that Lucy was living with Steve Mernin at the time she was killed. Gittelson had known Mernin for a couple of years; he lived in her mother's neighborhood. Gittelson did not approve of Lucy living there because Mernin drank excessively and used drugs. Gittelson said she learned after the fact that Mernin was escorted in a drunken rage from the hospital where Lucy had been admitted on May 3, 2003. Gittelson was aware that her sister had a criminal history. She was also aware that a wrongful death action had been filed against defendant in connection with Lucy's death. When asked whether she or her family ever suspected that Steve Mernin was responsible for Lucy's death, Gittelson first answered in the negative, but *142 then alluded that she had suspected that. However, when asked why she had suspicions that Mernin caused Lucy's death, Gittelson explained that she did not really suspect Mernin was the cause. She just knew that he was not a good person and that Lucy had gone there after defendant had beaten her. Lucy never told her that Mernin had struck her. Gittelson said it would surprise her if someone were to say that Lucy had been fearful of Mernin. Gittelson confirmed on cross examination that it was Lucy's children who had filed the civil suit against defendant.
Stephanie Briscoe was qualified by stipulation as the custodian of records for the New Orleans Police Department's communications division, where she was a senior dispatcher. Briscoe identified the record of a call received on May 2, 2003 at 1:35 p.m., from a C. McManna at 6336 Pratt Drive. Originally the call was recorded as relative to a domestic aggravated battery, but was later changed to a simple battery. The perpetrator, identified as an unnamed white male friend of the victim, was to be located 6316 Pratt Drive. The perpetrator was reportedly armed. Officers arrived at 6336 Pratt Drive at 1:46 p.m., and relocated to 6316 Pratt Drive at 1:47 p.m.
New Orleans Police Officer Ashish Shah testified that at approximately 1:00 p.m. on May 2, 2003, he responded to a 911/unknown disturbance call at 6316 Pratt Drive. Upon arrival he observed a female outside whose first name was Lucy. Lucy had blood on her shirt and on her face and upper head area. She reported that she had been involved in an altercation inside with an individual identified as Jack, and he had beaten her. The individual identified as Jack informed the officer that in fact there had been an altercation and that he had struck Lucy. Officer Shah issued a municipal summons to defendant. Lucy refused EMS treatment, and Officer Shah relocated her to a residence on Fortin Street for her own safety. Lucy's face was a little bruised. Officer Shah said on cross examination that Lucy appeared excited and emotional. The officer said he could have arrested defendant on a state felony offense of aggravated battery or second degree battery but that because of the circumstances he chose to issue defendant a summons charging him with municipal simple battery.
Orleans Levee District Police Department Captain Craig Boudreaux testified that he was working a paid detail in Lake Vista shortly before 2:00 p.m. when he responded to a call of a subject barricaded in a house at 6316 Pratt Drive. Upon arrival he observed a white female with blood matted hair on the left side and blood on her shirt walking up and down the street yelling that she had been beaten. Capt. Boudreaux confirmed on cross examination that the report of a subject barricaded in his residence had been was erroneous.
Jacob Oberman, a paramedic with the City of New Orleans EMS, testified that he responded to 6316 Pratt Drive at approximately 1:30 p.m. on May 2, 2003. He recalled a female with a blood-soaked shirt and hair. He recalled that she had a laceration hematoma to the top of her head, in the pragmatic [sic] area. Oberman stated that he informed the victim that she might have sustained an occult or hidden injury, the result of which could be paralysis, infection or even death. However she declined treatment and did not fit the criteria necessary to transport against her will. Oberman noted the victim's past medical history of Hepatitis C, HIV and intravenous drug abuse. He confirmed on cross examination that the trauma to the victim's head was not so severe that it impaired her judgment such that she would have been transported to a hospital *143 against her will. She did not have a staggered gait, appear dizzy or groggy, or show other signs of head trauma. Oberman said he believed he documented that the victim was not actively bleeding.
Dr. Noel Lozes, an emergency room physician at Mercy Hospital, was qualified by stipulation as an expert in emergency medicine. Dr. Lozes was working the 7:00 a.m. to 7:00 p.m. shift on May 2, 2003, when Lucy Ceperiano presented for treatment shortly before the end of the doctor's shift. Dr. Lozes recalled, from her records, that Lucy had been able to converse with her and give her a history. Lucy reported having been beaten with a rifle and complained of neck and back pain. Lucy had swelling over the left eye, a hemorrhage in the left eye, and some nasal bleeding. Dr. Lozes ordered a CAT scan for Lucy before her shift ended. She saw Lucy for perhaps a total of ten minutes. Dr. Lozes confirmed on cross examination that Lucy did not report a laceration to her head, and that she would have noted it on her report if Lucy would have reported it or if she had observed it. The doctor's report noted that Lucy had a nosebleed, neck and back pain, and bruising and swelling on her face. Dr. Lozes was shown the results of the CAT scan which had been completed at 9:36 p.m. It showed maxillary sinus fractures that were not life threatening. Dr. Lozes stated that if the report indicated no subdural hemorrhage it would have been safe to discharge Lucy as a patient with no injury. The doctor said that it would be highly unlikely for a person with that report to go on and have other problems.
On cross examination Dr. Lozes testified she saw nothing in her records indicating that Lucy informed her that she was HIV positive. She said that condition would make Lucy more compromised, that it might have changed the treatment of Lucy, but that she really did not know. When Dr. Lozes was asked hypothetically whether the chance of a patient in Lucy's circumstances having a subsequent problem was very remote, the doctor replied: "It would not be out of the realm of possibility." Dr. Lozes estimated that she had seen one head trauma case a day in her eighteen years of working in emergency rooms and she had never seen a patient, HIV positive or not, come in with a head trauma, have a CAT scan as clean as the one Lucy had, be observed for eight hours, and then come back five hours later unconscious with a giant subdural hematoma. Dr. Lozes testified that assuming Lucy was released from the hospital at 1:00 a.m. and brought back in unconscious at 7:00 a.m. after receiving additional head trauma, it would be more likely that the later head trauma caused her subdural hematoma. However, she followed up by stating that she could not really say for certain. Dr. Lozes confirmed that the CAT scan showed nothing abnormal in Lucy's head no edema, no swelling, no bleeding (hemorrhage), or subdural or epidural abnormalities. When asked whether it was fair to say that there was a certain danger point which the doctor who released Lucy from the hospital thought Lucy had passed, Dr. Lozes replied: "Probably so." Dr. Lozes essentially stated that it would have been unlikely that Lucy's unconsciousness and large subdural hematoma were related to that initial trauma for which she initially sought treatment.
Dr. Lozes said on redirect examination that she would have categorized Lucy as a head injury patient when Lucy first came to the emergency room. She said that when head injury patients are released they are instructed to have someone awaken them every two hours and to come right back to the hospital if they have any focal weakness, change in mental status or other problems. Dr. Lozes said this was because, *144 even though it was unlikely, she had heard of people who have returned several days later with problems. Dr. Lozes said she had never seen this herself.
Patricia Chaplain testified that she had known the victim through the neighborhood, and that Lucy had been a friend of her brother Steve Mernin. She recalled that Lucy was taken to the hospital at approximately 11:00-11:30 p.m. on May 2, 2003. She visited Lucy at the hospital. The left side of Lucy's face was black and blue, she had blood in her hair and nose, her mouth was crusty and her arms were bruised. She said it appeared to her that Lucy was having seizures. Chaplain said her late son used to have seizures and it appeared to her that what she witnessed Lucy going through was the same thing she had witnessed with her son. She said Lucy would get "that stare," the eyes would roll back, and then she would just go out. Chaplain said she observed this occur between five and seven times and informed a physician and a nurse of her observations.
Chaplain said she stayed with Lucy until after 1:00 a.m. She pleaded with the physician not to discharge Lucy, but he said she would be fine. The doctor told her to let Lucy sleep, but to wake her every half hour and to give her Gatorade. Chaplain said she told the doctor to keep Lucy one more hour, that she would go to get the items Lucy needed and then telephone the doctor when she got back to Mernin's apartment to see if Lucy was still being discharged. When Chaplain telephoned the doctor between 1:30 and 2:15 a.m. he informed her that Lucy was fine and to come pick her up. Chaplain took Rocky Ruiz[1] with her, in case Lucy had a seizure on the way home. She said Lucy had one more "seizure" before she left. Lucy's vital signs dropped after she got into a wheelchair to be taken out, but the doctor said she would be okay. Chaplain did not know whether Lucy was able to walk on her own because Ruiz picked her up and put her in a car. They took Lucy to Mernin's apartment on Sauvage Street, where she was living. Ruiz carried Lucy upstairs and put her in bed. Chaplain left Lucy with Mernin and Ruiz forty-five minutes later and went home.
Chaplain said on cross examination that she never saw her brother Steve Mernin at the hospital. She knew he had gone there with his landlady but had left before she arrived. She knew Mernin had been upset at the hospital, and that was why she got Ruiz instead of Mernin to go with her to pick up Lucy. Chaplain first saw Mernin that night when she took the Gatorade and some soup to Mernin's apartment before Lucy was discharged. She did not know how long Lucy had been living with Mernin, but she had known her from the neighborhood, which was near The Fairgrounds Racetrack. She said Mernin and Lucy were living together as boyfriend and girlfriend. Chaplain said neither the doctor who released Lucy nor the nurse had believed her when she told them Lucy was having seizures. She said the doctor came into the room twice but the seizures had ended by then. Chaplain conceded that Mernin had told her that he and Lucy used to have arguments. Chaplain said she was a recovered alcoholic, but never had problems with the law. Asked whether she would lie for her brother in connection with Lucy's injuries and death, Chaplain said that considering the condition Lucy was in she would not lie for anybody.
*145 Steve Mernin testified that he had met Lucy Ceperiano a couple of years previously through others who lived in their neighborhood off Esplanade Avenue near the New Orleans Fairgrounds racetrack. Lucy's mother lived around the corner from Mernin's Sauvage Street apartment. Mernin lived above Rocky Ruiz. Mernin and Lucy had a romantic relationship, but he characterized it as more of a friendship. She lived with him on and off, and was always welcome in his apartment. Mernin testified that he had an alcohol abuse problem, and that Lucy drank quite a bit and was on Methadone. Mernin admitted that he and Lucy argued during their relationship, but he denied that he ever physically abused her. Mernin recalled returning home from the New Orleans Jazz and Heritage Festival and being informed by a friend that Lucy was in the hospital. Mernin, who had been drinking at the Jazz Festival, went to Mercy Hospital very upset. He confirmed on cross examination that he was drunk. Hospital personnel at first refused to allow him to see Lucy, but one nurse eventually permitted him to see her. A physician questioned Mernin, stating that he did not know whether Mernin had been the one who did this to Lucy. The brief conversation ended with the doctor telling Mernin that he had to leave because he was not related to Lucy. Mernin said the doctor was upset and that he too was upset.
Mernin left the hospital and went home, where he contacted his sister, Patricia Chaplain. Chaplain and Rocky Ruiz later took Lucy to Mernin's apartment. Mernin described Lucy as extremely beaten up. He and Ruiz woke up Lucy once to give her some Gatorade. Mernin dozed off and awoke to hear Ruiz calling Lucy's name. Lucy had apparently gotten out of bed and collapsed. They put her back in bed. Mernin said she was stiff, with her eyes rolled back. They telephoned an ambulance, and Lucy was taken to the hospital.
Mernin said on cross examination that the first time he saw Lucy on the day she was injured was in the hospital. Mernin did not remember what he and Lucy argued about during any of their arguments. He denied ever using drugs with Lucy. Mernin was asked about an occasion when his apartment neighbor Susan Arruebarrena, complained that Mernin had slammed something against their common apartment wall so hard that it knocked over a piece of her furniture and broke her dishes. Mernin said that incident was Rocky Ruiz pushing a table against the wall. Mernin denied that he and Lucy argued about drugs or money on the night/morning of May 2-3, 2003, when she came to his apartment from the hospital. Mernin said Lucy could not stand up that night, and that it was his opinion she should not have been released from the hospital. Mernin did not recall telling police he had seen Lucy at 8:15 a.m. on Friday, May 2, 2003, and stated that he did not see Lucy Friday. Mernin denied asking anyone to say he or she was with him while Lucy was in his apartment so he would have an alibi. Mernin replied in the negative when asked if he would describe himself as a violent person.
Belinda Helffrich testified that on May 3, 2003 she was employed as a paramedic with American Medical Response Ambulance Service. She was dispatched to 1628 Sauvage Street at 8:34 a.m. on that day. Helffrich said that a female was in bed and that she only responded to deep painful stimuli. Helffrich confirmed on cross examination that the female was unconscious by the time she arrived and that her eyes were fixed and dilated, suggestive of a brain injury or drug overdose. Other than that her vital signs were within normal limits. Helffrich noticed a bruise to the *146 woman's left eye, but could not remember any other bruises. The ambulance left the Sauvage Street residence for Mercy Hospital at 9:10 a.m. Helffrich confirmed on cross examination that her report reflected that someone had reported that the female had fallen and hit the back of her head. Helffrich said she did not get any names from the three persons present at the Sauvage Street residence.
Dr. Gregory Dowd was qualified by stipulation as an expert in the field of neurosurgery. Dr. Dowd testified that he saw Lucy Ceperiano for neurological evaluation shortly after noon on May 3, 2003. She had been transferred from Mercy to Baptist Hospital. She was very neurologically impaired. She had bruising over her left eye and was unable to respond to voice or pressure stimulus. She had only very abnormal movements of her extremities, and her pupils were dilated and not reactive. Dr. Dowd was shown a CAT scan of Lucy's head done at approximately 10:00 a.m. on May 3, 2003. He said it showed a hemorrhage that was placing pressure on Lucy's brain. Lucy was taken into emergency surgery where her skull was opened to the brain and the hematoma removed. He said the indications after surgery were not good, and medication was administered to minimize brain swelling. However, treatment was unsuccessful and Lucy died. As to the cause of the subdural hematoma, Dr. Dowd said that from examining Lucy he could see bruising over her eye and a small laceration on the top of her head. He said these observations led him to conclude that there had been some sort of blunt trauma to that area. Dr. Dowd examined the first CAT scan, done on the night of May 2, 2003, during Lucy's first trip to the hospital. He said it showed a fracture of the bony rim surrounding the left eye, which he confirmed was in the same area where the subdural hematoma was situated on the second CAT scan. Dr. Dowd confirmed that it was possible for an abnormality to develop in a delayed fashion. He was shown a pellet gun and a flashlight seized from defendant's home, and asked whether a blow from one of those items could cause an injury that would later cause a seizure. He replied that if struck with the degree of force sufficient to cause an identifiable fracture in the skin it potentially could have resulted in a brain injury that might cause a seizure. He said that a person having a seizure shakes, has convulsive activity and the blood pressure goes quite high. He also said that if there is a fall connected with that there is force coming from the fall. He said those factors could contribute to the development of "a hemorrhage such as that."
On cross examination, Dr. Dowd confirmed that the first CAT scan showed a normal brain, and that the fracture was below the left eye. Dr. Dowd stated that it was certainly unusual to have a normal CAT scan and then approximately twelve hours later have a grossly abnormal scan. He said something had to trigger the hemorrhage. He noted the prior mention of possible physiologic changes, but also stated that some other blow could have caused it. Dr. Dowd was essentially asked how many times in his experience had he seen a case like Lucy's in which the subsequent hemorrhage happened spontaneously. The doctor replied that it was unusual and that he had seen it only several times in close to a thousand cases.
Dr. Sherif Sakla was qualified by stipulation as an expert in emergency medicine. He was present when Lucy Ceperiano came in on the morning of May 3, 2003 comatose, and he ordered a CAT scan. Dr. Sakla said that the CAT scan x-rays from Lucy's first visit to the hospital on May 2, 2003 showed a fracture of the orbit, the wall of the maxillary sinus and the *147 floor of the maxillary sinus. He said the views of the brain taken in that May 2, 2003 CAT scan showed a perfectly normal brain, while the May 3, 2003 CAT scan showed a hematoma in the brain that was pushing Lucy's brain against her skull. Dr. Sakla was asked if a direct blow to the head with a flashlight or a rifle butt could cause a subdural hematoma, and he replied in the affirmative. Dr. Sakla said that the CAT scans showed evidence of three minimal or greater blunt traumas to the left side of Lucy's head, and the subdural hemorrhage was also on the left side. With regard to Lucy falling after being released from the hospital, Dr. Sakla stated that the cause could have been that she was suffering from a concussion, had a small seizure or had a "decerebration" or blood clot develop in the subdural space. Dr. Sakla said Lucy was not a healthy person: She abused alcohol and multiple drugs, was a heavy smoker, and had a history of Hepatitis C and HIV, with a suppressed immune system. The doctor stated during cross examination that Lucy had a significant amount of cocaine in her system, presumably meaning as of the first hospital visit. Dr. Sakla said an unhealthy person such as Lucy could have delayed effects from blunt trauma. The doctor explained that a normal person who suffered a bruised brain might simply get a headache, but that Lucy, with her "weak constitution," could have developed "lay [sic] bruises that caused her second trauma or the second event that causes subdural."
Dr. Sakla was asked on cross examination for the protocol in the Mercy Hospital emergency room concerning a blunt trauma patient already examined and being monitored who is reported as having seizures. He said that situation would call for a thorough neurological re-evaluation. He confirmed that ignoring it would be improper. Dr. Sakla essentially confirmed, using a hypothetical situation, that what happened with Lucy Ceperiano was not normal insofar as her having a clean brain scan, being released from the hospital, and then returning with the subdural hematoma. Dr. Sakla said that in his twenty years of seeing hundreds of blunt trauma patient he had seen something similar only once. However, he also stated that while the blunt trauma initially received was not a direct cause of the subdural hematoma, it began a chain of events that resulted in it by causing the fainting, seizure, etc. He compared delayed bleeding in the brain to bruising, noting that when someone hits his arm the bruise does not immediately appear. As to a seizure occurring hours later, Dr. Sakla said it happened all the time, noting that because of this when blunt trauma patients are released from the hospital they are given a "head precaution sheet" detailing what to expect in the next twenty-four hours. He estimated that less than one percent of the time those patients have symptoms such as nausea, blurred/double vision, drowsiness within the twenty-four-hour-period. Dr. Sakla said that in his twenty years of seeing hundreds of blunt trauma patients he had seen something similar only once. Finally, Dr. Sakla, who was also an attorney, conceded on cross examination that while being interviewed by a detective he said that since it was not known what happened after Lucy left the emergency room it would be very difficult to establish whether there was intervening trauma or the original event that caused the subdural hematoma. However, he said that was spoken as a lawyer not as a physician.
New Orleans Police Department Crime Lab technician Steve Villere testified that he went to Memorial Hospital on May 3, 2003 to take photographs of the victim. He identified those photographs.
Dr. Gerald Liuzza, qualified by stipulation as an expert in the field of pathology, *148 performed an autopsy on Lucy Ceperiano on May 7, 2003. The victim's entire head was wrapped in heavy gauze bandages. The skin over the left side of her face, the left cheek and the area around her left eye was blue and very swollen. He also observed an abrasion in the center of the area of bruising on the left cheek. He did not see any direct injury to the eye. He noted a large amount of bleeding underneath the scalp and over the surface of the skull. A three-inch piece of Lucy's skull had been removed in the area of the left temple. Dr. Liuzza said that a large amount of brain substance normally present in the left temporal area was missing and the remaining brain in the immediate vicinity was very soft and bloody. He said this could be an indication of surgery or injury, or a combination of both. The brain was, generally speaking, very swollen. He noted bruising on her left wrist, but did not see any puncture holes suggestive of intravenous hospital needles having been inserted at the location. He subsequently found bruising on the left side of the arm just above the elbow; he said these bruises on the wrist and arm would have been consistent with someone holding her by her arms and wrists, respectively, or from being bound or handcuffed. Dr. Liuzza arrived at a cause of death based on his autopsy and the medical records he reviewed. He said Lucy Ceperiano died as a result of severe brain injury sustained from a rather forceful blow delivered to the left side of her skull or the left side of her head. He classified the death as a homicide. When asked whether a crack in the head by a flashlight could have caused the head injury. Dr. Liuzza said that would be possible. When asked whether the injuries could have been caused by someone using the pellet rifle seized from defendant's home on the victim's head, he replied that would be possible, depending on how the object was used.
Dr. Liuzza said the first CAT scan showed a fracture of the sinus wall in the left maxillary sinus with a fairly significant accumulation of fluid he thought was probably blood. He did not see any abnormalities in the brain and skull. The second CAT scan showed a large accumulation of blood over the brain that appeared to be a subdural hematoma. He explained that a subdural hematoma was blood clotting in the thin space between the brain and the dura, a tough membrane covering the surface of the brain and which lines the inside of the skull. Dr. Liuzza stated that a number of things could predispose one to bleeding hours after an injury. He said a blood vessel could have been weakened by an injury and subsequently rupture. He stated that alcoholics generally experience subdural hematomas more easily than nonalcoholics. Dr. Liuzza also said that minor events such as stepping off a step or turning one's head to look up could trigger bleeding if an injury had caused a blood vessel to be on the verge of rupturing. Dr. Liuzza believed the injury from which Lucy Ceperiano died was sustained by her within hours to perhaps one to two days prior to the time of death. But, he confirmed that a blunt force trauma injury caused by a blow from a flashlight or rifle butt on May 2, 2003 would be consistent with the subsequent development of a subdural hematoma and the death of the victim on May 5, 2003.
Dr. Liuzza commented on cross examination that a photograph shown to the jury that depicted Lucy Ceperiano with a bloody bandage wrapped around the entire visible part of her head was a postoperative photograph. He noted that a "simple little cut" would not warrant bandaging the entire head. Dr. Liuzza said his office's toxicology tests showed only caffeine and a seizure-suppressing drug in Lucy Ceperiano's blood. He said the hospital *149 toxicology test results showed a byproduct of cocaine and two byproducts of sleepinducing/relaxation drugs such as Valium, Librium or Xanax. Dr. Liuzza said he did not find any cut on Lucy Ceperiano's head, although he looked for one. He concluded that "it" was likely incorporated into the incision into the scalp, which he said was a common occurrence.
New Orleans Police Homicide Detective Sergeant Lawrence Green testified that he obtained an arrest warrant for defendant and a search warrant for his residence after Lucy Ceperiano died and her body was autopsied. He made the decision to arrest defendant after he viewed the deceased victim's injuries. Sgt. Green identified the pellet gun seized from the side of defendant's residence and the flashlight with which defendant later admitted striking Lucy Ceperiano. The detective identified a taped statement given by the defendant after his arrest and a transcription thereof.
Defendant said in his statement that the May 2, 2003 incident began early that morning when Lucy Ceperiano saw him purchase fifty dollars worth of crack cocaine. Some forty-five minutes later, at approximately 3:00 a.m., Lucy Ceperiano telephoned defendant, asking if she could come over. Lucy came over and the two smoked some crack. Another female, Elizabeth Cox, who had been living in defendant's residence for some two and one-half years, was also in the residence at the time. At some point Lucy orally copulated defendant. Afterward, he fell asleep and Lucy took a shower. A female acquaintance of defendant came to his home to ask him for a Valium. Defendant said he could not find his prescription bottle of Valium, nor any of his prescription bottles that had been inside a drawer. He subsequently noticed what appeared to be the outline of a prescription bottle in Lucy's pants. He asked to see it, and Lucy refused. Defendant grabbed it from her and discovered that it was one that had been in his drawer. Lucy said Cox had dropped it. Defendant accused Lucy of taking it. Defendant asked Cox to get Lucy's purse so they could look inside and see if anything else from his residence was in there. Cox wrested it from Lucy. Inside the purse were pills and some jewelry from his home, as well as his cocaine. Lucy said she was taking the jewelry to polish it. Defendant said Lucy had taken some Xanax.
Defendant said Lucy was hollering and attempting to leave, so he and Cox vainly tried to restrain her by attempting to place a set of plastic handcuffs on her. Defendant said he was not going to let Lucy leave until he determined what else she was attempting to steal. Lucy was hollering and screaming and would not shut up. Defendant said that at one point Lucy had a screwdriver in her hand. Defendant warned Cox that Lucy could use that as a weapon. Defendant said he and Cox forcibly took the screwdriver from Lucy. He also stated that Lucy was trying to bite Cox. Lucy hit defendant. He hit her in the head one time with a flashlight. Lucy was running around bleeding and falling down. Defendant also said he struck Lucy in the face with his hand once or perhaps twice. He also hit her in her side to try to knock the wind out of her. He said she was yelling a lot, and he did not want the neighbors to hear her. Lucy finally got loose and ran outside. Defendant said the only thing he was missing after the incident was a set of keys to his residence.
Sgt. Green confirmed on cross examination that everything defendant said in his statement was consistent with what the detective learned in his own investigation. Sgt. Green also confirmed that at some point in time there was doubt as to whether *150 the homicide was going to be a First District case or a Third District case. Steve Mernin's Sauvage Street apartment from which the comatose Lucy was transported to Mercy hospital on May 3, 2003 was located in the First District. Sgt. Green stated that at the time he took over the case a First District homicide detective was considering that the homicide could have occurred on Sauvage Street. Sgt. Green testified that what cleared up the matter for him was that the incident that occurred at defendant's residence immediately preceded Lucy Ceperiano's medical treatment, and there was nothing to prove otherwise. Defense counsel asked the detective about the names of individuals he had interviewed during his investigation, including Dennis Penton, who Sgt. Green said he believed was Lucy Ceperiano's ex-husband. The detective admitted that some people he interviewed had a reason to steer him away from Steve Mernin and toward defendant. However, Sgt. Green stated that in his investigations he always considers the totality of the evidence and witness statements to arrive at his conclusion. He said his investigation revealed that the injury Lucy received at the hand of defendant caused her death. Sgt. Green said that on the one occasion he interviewed Susan Arruebarrena, Steve Mernin's next door neighbor, she was slurring her speech and he thought she appeared to be intoxicated. He really could not get her to lock into a certain date and time on the statement that she was giving, and so he was not really satisfied with what she told him.
Susan Arruebarrena, the sole defense witness to testify, stated that she recently suffered a heart attack and had tumors on her liver. Arruebarrena testified that she had known Lucy for approximately twenty-five years and had first met her through Lucy's mother. Arruebarrena said she was living at 1630 Sauvage Street on May 2-3, 2003. Steve Mernin was then living next door to her, and Lucy had been living with him for approximately five to six months at that time. She said Mernin and Lucy were constantly fighting and that Mernin's drunkenness would precipitate the fights. She believed Mernin physically abused Lucy. Arruebarrena said she had seen Lucy a few times with black eyes, and that Lucy had told Arruebarrena who had given them to her. Arruebarrena said that on the night/early morning of May 2-3, 2003 she was awakened by a loud crash. She discovered broken china in the kitchen. Arruebarrena said she heard Lucy screaming for somebody to help her. She also heard Lucy say "Now, look what you did to me. You threw me up against the wall. I'm bleeding." Arruebarrena said Lucy ran outside and started screaming for help and for somebody to call the police. She said, "I know you stole my check, you stole my medication to go by [sic] crack. I want my stuff back." Arruebarrena said Mernin locked Lucy out of the apartment and Lucy kept beating on the door. Finally, Lucy walked down the stairs to the alley, got her bicycle, and rode off on it. Arruebarrena said Mernin left his apartment after Lucy rode off. Arruebarrena also testified that before Lucy left she heard Lucy talking to Rocky Ruiz, downstairs where Rocky lived. Arruebarrena said all this transpired in the middle of the night. Arruebarrena said that the next morning she went to the Burger King at Canal and North Broad Streets for breakfast, as she often did. While there Dennis Penton, Lucy's ex-husband, came and sat in her booth, and Arruebarrena learned that Lucy was in the hospital.
On cross examination Arruebarrena was asked why she did not call the police that night, and she replied that she did not have a telephone. Arruebarrena was *151 asked on redirect examination whether she wanted to come testify at the trial, and she replied in the negative, as she had during her direct testimony.
Elizabeth Pennington, testifying as a State rebuttal witness, stated that she owned the Sauvage Street property where Mernin, Lucy and Arruebarrena were living. Pennington said she recalled that on the Wednesday of the week Lucy was injured and went to the hospital, Ms. Arruebarrena complained to her about china having been broken in Arruebarrena's residence, and about "a noise and raucous" [sic] going on during the night/early morning hours of Tuesday/Wednesday. Pennington said she had seen Lucy Wednesday morning before hearing the complaints from Arruebarrena later that day. Lucy did not have any injuries at that time. Pennington also said that she went with Lucy to the grocery store on Thursday and purchased a lot of food to cook for the Jazz Fest. The last time she saw Lucy before she was injured was on Thursday night/early Friday morning, shortly after midnight. The next time Pennington saw Lucy was in Mercy Hospital on Friday night, May 2, 2003. Pennington and Mernin went to Mercy Hospital searching for Lucy, after they were unable to find her at Charity. Pennington said Mernin was quite upset trying to figure out what had happened to Lucy and where she had been. Pennington said one could see that Lucy had been beaten in the face and on the top of the head, noting that she had dried and fresh blood in her hair. Pennington left the hospital at 10:30 p.m. She said that the next morning, Saturday, May 3, 2003, Mernin came to tell her something was wrong with Lucy. Mernin asked her to come over and to bring her telephone, since he did not have one. Pennington said Lucy could not move. Her eyes were wide open, her hands were curled up and her legs were distorted. When asked whether she noticed any additional injuries on Lucy, Pennington replied in the negative, stating that Lucy had really not been cleaned up from the hospital and that the same bruises that she had seen the day before were still there.
Pennington was quizzed on cross examination as to the issue of her ability to recall dates. She denied that she was coached by the State as to the pertinent dates to which she needed to testify. She explained how she recalled the dates by stating that her birthday is May 6. Pennington admitted that Mernin had been working for her for the past two or three years doing maintenance on her property, and that she had known him approximately seven years. She admitted that she considered Mernin to be a friend or an acquaintance. However, she said she was not any closer to Mernin and Lucy, than she was to Ms. Arruebarrena and her husband. But, when asked whether Arruebarrena ever complained to her about the dilapidated condition of the apartment they rented from Pennington, Pennington answered sarcasticly "Did she ever pay her rent?" Defense counsel then asked whether Pennington had a problem with Arruebarrena. Pennington replied in the negative, stating that Arruebarrena's husband was unemployed most of the time and that with the couple's drug use, and being methadone clinic patients, they chose not to pay their rent. Pennington said she did not have the heart to put them out. She also said Arruebarrena's husband was supposed to fix the roof over their apartment in lieu of rent, but he apparently never did. Asked whether Dennis Penton, Lucy's ex-husband, would have been lying if he had said that the night before Lucy was in the hospital was the night Arruebarrena's china crashed to her kitchen floor, Pennington replied in the affirmative.
*152 Pennington was further asked on cross examination about Mernin's state of intoxication while at Mercy Hospital. She simply said that he had been drinking. She admitted Mernin was told by hospital personnel that if he did not calm down he would be asked to leave. She said Mernin saw Lucy in the hallway, not being treated, and kept asking questions of the personnel that were not being answered. She admitted that Mernin was asked to leave and that once outside a security guard told Mernin he would not be permitted to re-enter. Pennington denied that she was a close friend of Mernin or that she was testifying to protect Mernin because she knew that he threw Lucy against a wall and caused her injury. She further denied knowing for a long time of a connection between Mernin and Lucy's injuries.

ERRORS PATENT AND ASSIGNEMNT OF ERROR NO. 9
A review of the record reveals no patent errors.

ASSIGNMENT OF ERROR NO. 1
In this assignment of error, defendant argues that the evidence was insufficient to support the conviction of manslaughter.
This court set out the well-settled standard for reviewing convictions for sufficiency of the evidence in State v. Ragas, 98-0011 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
98-0011 at pp. 13-14, 744 So.2d at 106-107, quoting State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228.
*153 Manslaughter is defined by La. R.S. 14:31(A), in pertinent part, as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or ...
In the instant case, the medical circumstances surrounding Lucy Ceperiano's death were very unusual, according to all of the expert medical testimony. The CAT scan done on the victim on May 2, 2003, within hours after defendant admittedly struck the victim "on the head somewhere" with a flashlight showed facial bone fractures but no subdural bleeding. She was released from the hospital and went home conscious but in a somewhat weakened condition. Later that morning, on May 3, 2005, the victim was discovered at home in a coma and was rushed to the hospital where a second CAT scan revealed a subdural hematoma, complications from which the victim died on May 5, 2003.
Paramedic Jacob Oberman testified that the victim had a blood-soaked shirt and hair but was not actively bleeding on the morning of May 2, 2003. This was shortly after the initial incident. Oberman recalled that the victim had a laceration hematoma to the top of her head. Dr. Noel Lozes, the emergency room physician on duty at Mercy Hospital when the victim first presented there on Friday, May 2, 2003, testified that the CAT scan he ordered of Lucy's head showed only maxillary sinus fracturesnothing life-threatening nor anything such as edema, swelling, bleeding (hemorrhage) or subdural or epidural abnormalities. Dr. Lozes said that it would be highly unlikely, but not out of the realm of possibility, for such a person to go on and have other problems. The doctor had treated one head injury case a day for eighteen years and had never seen a patient come in with a head trauma, have a CAT scan as clean as the one Lucy had, be observed for eight hours, and then come back five hours later unconscious with a giant subdural hematoma. Dr. Lozes was asked hypothetically whether, if a person in Lucy's circumstances experienced head trauma after leaving the hospital, it would more likely be that the later head trauma was a cause of her subsequent subdural hematoma. Dr. Lozes replied in the affirmative, but added that he could not say for certain.
Dr. Sherif Sakla, an expert in emergency medicine, was present when Lucy Ceperiano came to Mercy Hospital comatose on the morning of May 3, 2003. Dr. Sakla said the May 2, 2003 CAT scans showed evidence of three at least minimal blunt traumas to the left side of Lucy's head, and that the subsequent subdural hemorrhage was also on the left side. With regard to Lucy possibly falling at home after being released from the hospital, Dr. Sakla stated that the cause of such a fall could have been that she was suffering from a concussion, had a small seizure or had a "decerebration" or blood clot develop in the subdural space. Dr. Sakla said *154 Lucy Ceperiano abused alcohol and multiple drugs, was a heavy smoker, and had a history of Hepatitis C and HIV, with a suppressed immune system. Lucy also had what the doctor described as a significant amount of cocaine in her system. Dr. Sakla said an unhealthy person such as Lucy could have had delayed effects from blunt trauma. He stated that while the blunt trauma initially received was not a direct cause of the subdural hematoma, it began a chain of events that resulted in it by causing the possible fainting, seizure, fall etc. He also compared delayed bleeding in the brain to bruising, noting that when one hits his or her arm the bruise does not immediately appear. As to a seizure occurring hours later, Dr. Sakla said it happened all the time, noting that was why when head trauma patients are released from the hospital they are given a "head precaution sheet" detailing at home aftercare and what to expect in the next twenty-four hours.
Defendant points to the testimony by Dr. Gregory Dowd, a neurosurgeon who performed surgery on the victim at Baptist Hospital after she was transferred from Mercy Hospital in a coma on May 3, 2003. Dr. Dowd was asked about the cause of the subdural hematoma in the victim. He said that based on the bruising over her eye and the small laceration on the top of her head he concluded that there was some sort of blunt injury to that area. He said it was possible for an abnormality to develop in a delayed fashion. But he said that something had to trigger the bleeding after the clean CAT scan and the victim's release from the hospital. He noted the possibility of a seizure, high blood pressure or another event such as a fall. He said it was conceivable that another blow could have done it also. Dr. Dowd also discussed that in a fall when the head hits, for instance, the floor, the brain can pull away from one side of the skull and draw tension on a blood vessel.
Steve Mernin testified that after the victim was brought home from Mercy Hospital he awoke to find that she apparently had gotten out of bed and collapsed. Mernin said she was stiff, with her eyes rolled back. She was in a coma.
Paramedic Brenda Helffrich confirmed during her cross examination that her report reflected that on the morning of May 3, 2003, when she responded to Steve Mernin's Sauvage Street residence to find a female in a coma, someone stated that the female had fallen and hit the back of her head.
Patricia Chaplain, Steve Mernin's sister, testified that on May 2, 2003 she observed the victim in the hospital having what she believed were seizures. However, the doctor in attendance did not observe such seizures. Pathologist Dr. Gerald Liuzza who autopsied Lucy said a drug called methylphenetolen, which he believed was probably given to suppress seizure activity, was found in the victim's system after her death.
Dr. Liuzza also testified that she died as a result of severe brain injury sustained from a rather forceful blow delivered to the left side of her skull or the left side of her heada homicide. Dr. Liuzza stated that a number of things could predispose one to bleeding hours after an injury. He said a blood vessel could have been weakened by the injury and subsequently rupture under normal blood pressure. The doctor stated that alcoholics generally are known to have subdural hematomas more easily than non-alcoholics. Dr. Liuzza also said minor events such as stepping off a step or turning one's head to look up could trigger bleeding if an injury had caused a blood vessel to be on the verge of rupturing. Dr. Liuzza believed the injury from which Lucy Ceperiano died was sustained *155 by her within hours to perhaps one to two days prior to the time of death. However, he also confirmed that a blunt force trauma injury caused by a blow from a flashlight or rifle butt on May 2, 2003 would be consistent with the subsequent development of a subdural hematoma and the death of the victim on May 5, 2003.
The State is not required to show that the defendant's conduct is the sole proximate cause of the victims death in order to satisfy the causation element in a homicide case. See State v. Stone, 33,-383, p. 5 (La.App. 2 Cir. 5/15/00), 758 So.2d 997, 1001. It is sufficient to show that the defendant's actions were a contributing cause or substantial factor in the resulting death of the victim. Id. A coroner's testimony regarding his autopsy is competent evidence to prove the cause of death. Id. In State v. Stone, supra, the defendant stabbed his roommate/homeowner, to whom he was paying rent, after the roommate said he was going to increase the defendant's rent. The victim was hospitalized for approximately two weeks and developed pneumonia before dying of a stroke. The defendant was tried for and convicted of second degree murder. He argued on appeal that the State had failed to prove causation. The coroner testified at trial that the victim had a carotid artery occlusion that made him susceptible to having a stroke if he suffered some further insult. The coroner testified that but for the stab woundthe "further insult"the victim would not have died of a stroke at that point in time. This evidence was deemed sufficient to sustain the causation element of the offense.
In the instant case, we find any rational trier of fact, viewing the aforementioned evidence and all of the other evidence in a light most favorable to the prosecution, particularly the testimony of pathologist Gerald Liuzza, could have found all of the essential elements of the offense of manslaughter present beyond a reasonable doubt. That is, any rational trier of facts could have found beyond a reasonable doubt that defendant struck defendant on the left side of her head with a flashlight, and that as a result of that injury, within twenty-four hours, she began bleeding in her brain on the left side, causing her to go into a coma and die two days later.
Defendant argues on appeal that his taped statement indicated that the only reason he struck Lucy Ceperiano was in self-defense and in defense of property. However, the extent of his argument on this issue is his citing of La. R.S. 14:19, providing that the use of force or violence upon the person of another is justifiable when committed for the purpose of preventing a forcible offense against the person or a forcible trespass against property in a person's lawful possession. La. R.S. 14:19 specifically states that it "shall not apply where the force or violence results in a homicide." The force or violence by defendant against Lucy Ceperiano resulted in a homicide. Therefore, La. R.S. 14:19 does not apply to this case. Defendant makes no other self-defense argument.
However, it can be noted that defendant did say in his statement to police that Lucy Ceperiano picked up a screwdriver, apparently to prevent defendant from searching her purse or person, and that she was attempting to bite Elizabeth Cox, who was then living with defendant. However, defendant and Cox took the screwdriver away from Ceperiano, and defendant's statement reflects that he struck the victim with the flashlight because she was yelling and screaming and he was afraid the neighbors would hear her. Thus, defendant did not strike the victim in the head with the flashlight because she was using force against him and/or Cox, nor because the victim was threatening *156 him or Cox, nor because he or Cox was in imminent danger of losing their life or of receiving great bodily harm. Defendant admittedly hit the victim to shut her up. Further, the victim was lawfully inside of defendant's home, and thus, although she may have been attempting to commit a theft, she was not committing or attempting to commit a burglary or robbery. Thus, clearly the justifiable homicide provision, La. R.S. 14:20, does not apply.[2]
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, defendant argues that the trial court erred in denying his motion for judgment not withstanding the verdict and/or for new trial, and his motion for release of juror information.
The Louisiana Code of Criminal Procedure does not provide for the mechanism of a motion for judgment notwithstanding the verdict. As to the denial of defendant's motion for new trial, the stated grounds for the motion pursuant to La. C.Cr.P. art. 851(1) and (5) was that the verdict was contrary to the law and evidence and that the ends of justice would be served by the granting of a new trial.
In State v. Snyder, 98-1078, p. 37, n. 21 (La.4/14/99), 750 So.2d 832, 859, n. 21, cert. granted, judgment vacated on other grounds, Snyder v. Louisiana, ___ U.S. ___, 125 S.Ct. 2956, 162 L.Ed.3d 884 (2005), the court stated:
The denial of a motion for new trial based upon La.C.Cr.P. art. 851(1) is not subject to review on appeal. State v. Skelton, 340 So.2d 256, 259 (La.1976) ("[W]e have uniformly held that a bill of exceptions reserved to the refusal of the trial judge to grant a motion for a new trial based on Article 851(1), relative to sufficiency of the evidence presents *157 nothing for our review.") (citations omitted); State v. Bartley, 329 So.2d 431, 433 (La.1976) ("It is well established in Louisiana that an assignment of error reserved to the denial of a motion for a new trial alleging that the verdict is contrary to the law and the evidence presents nothing for appellate review.") (citations omitted).
Snyder, 98-1078, p. 37, n. 21 750 So.2d at 859, n. 21. See also State v. Huckabay, XXXX-XXXX, p. 31 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1110-1111.
Accordingly, insofar as the denial of defendant's motion for new trial based on the ground that the verdict was contrary to the law and evidence, this assignment of error presents nothing for review.
Insofar as the ground that the ends of justice would be served by the granting of a new trial, defendant's argument is that the jury misunderstood the facts and applicable law. However, this is related to the second part of this assignment of error that the trial court erred in denying defendant's "Motion to Release Juror Information." By that motion defendant sought to have the court order the release of the telephone numbers and address information of the twelve jurors so that he could prove the jurors did not understand the jury charges nor certain pertinent facts in the case, and thus make his case for the granting of his motion for new trial and for judgment notwithstanding the verdict.
La. C.E. art. 606 states in pertinent part:
B. Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.
Defendant does not allege that any outside influence was improperly brought to bear upon any juror or that extraneous prejudicial information was improperly brought to the jury's attention. Rather, he alleges that one of the jurors stated that the medical testimony proved that it was not impossible for the victim's death to have been caused by defendant, thus indicating that the jury did not understand the concept of reasonable doubt. Defendant also maintains that the jurors indicated that the burden of proof was on defendant to prove that Steve Mernin perpetrated the crime, again suggesting that they did not understand the presumption of innocence.
Defendant's ultimate goal in seeking the juror information obviously was to extract information from the jurors as to their deliberative process and introduce this evidence in support of his motion for new trial. However, La. C.E. art. 606(B) bars such inquiry on its face, and defendant fails to show that the statute does not apply to this issue. Therefore, defendant has failed to demonstrate how the trial court erred in denying his motion to release juror information. Nor do defendant's allegations show that the trial court abused its discretion in denying the motion for new trial insofar as the motion was based on the ground that the ends of *158 justice would be served by the granting of a new trial.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO 3
In this assignment of error, defendant alleges that the trial court erred in limiting his cross examination of New Orleans Police Sgt. Lawrence Green, to whom defendant gave his statement.
An accused is entitled to confront and cross examine the witnesses against him. La. Const. art. 1, § 16. La. C.E. art. 611(B) provides that a witness may be cross-examined on any matter relevant to any issue in the case. Due process affords a defendant the right of full confrontation and cross examination of the State's witnesses. State v. Van Winkle, 94-0947, p. 5 (La.6/30/95), 658 So.2d 198, 201-202. The trial court has the discretionary power to control the extent of the examination of witnesses as long as the court does not deprive the defendant of his right to effective cross-examination. State v. Hawkins, 96-0766, p. 6 (La.1/14/97), 688 So.2d 473, 479; State v. Robinson, 99-2236, p. 6 (La.App. 4 Cir. 11/29/00), 772 So.2d 966, 971, reversed on other grounds, XXXX-XXXX (La.5/17/02), 817 So.2d 1131. It has been held that evidentiary rules may not supercede the fundamental right to present a defense. Id. However, evidence may be excluded if it is irrelevant. See State v. Casey, 99-0023, pp. 18-19 (La.1/26/00), 775 So.2d 1022, 1037. Further, confrontation errors are subject to the harmless error analysis; the verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial was surely unattributable to the error. State v. Broadway, 96-2659, p. 24 (La.10/19/99), 753 So.2d 801, 817.
Defendant cites thirteen instances of the trial court sustaining objections by the State during defense counsel's cross examination of Sgt. Green.
(1) Defendant first complains that the trial court erred by sustaining the State's objection when defense counsel presented Sgt. Green with a copy of a police incident report taken concerning the alleged attempted theft of defendant's car in the early morning hours of May 2, 2003, while the victim was at his home. The State objected to Sgt. Green testifying to someone else's report. Defense counsel failed to object to this ruling.
A defendant cannot avail himself of an alleged error unless he made a contemporaneous objection at the time of the error. La.C.Cr.P. art. 841(A); State v. Seals, 95-0305, p. 5 (La.11/25/96), 684 So.2d 368, 373, grant of post conviction affirmed on other grounds, State ex rel. Seals v. State, 2000-2738 (La.10/25/02), 831 So.2d 828; State v. Spain, 99-1956, p. 11 (La.App. 4 Cir. 3/15/00), 757 So.2d 879, 886. Not only does an objection have to be made, but La.C.Cr.P. art. 841(A) requires that a defendant make known the grounds for his objection, and he is limited on appeal to those ground articulated at trial. State v. Brooks, 98-0693, p. 9 (La. App. 4 Cir. 7/21/99), 758 So.2d 814, 819; State v. Buffington, 97-2423, p. 9 (La.App. 4 Cir. 2/17/99), 731 So.2d 340, 346.
By not objecting defendant has failed to preserve this issue for review. Moreover, defendant cites no authority for the proposition that it was error for the trial court to sustain an objection to Sgt. Green testifying to the hearsay information contained in a police report written by another officer in connection with an incident in which Sgt. Green was not involved. In addition, while defendant claims the report would have shown that the victim *159 was involved in the car theft, defense counsel failed to proffer the police report so this court could determine for itself the importance of the report. There is no evidence the report would have reflected that the victim was involved in the attempted car theft. Further, it appears defense counsel's examination of Sgt. Green at this juncture was simply directed to having the officer verify that everything defendant related in his statement, such as the attempted car theft, had been confirmed by Sgt. Green as true. After the objection was sustained, Sgt. Green replied in the affirmative to a question as to whether everything defendant said in his statement was consistent with what the officer later learned in his investigation.
(2) Defendant next complains that the trial court sustained the State's objection to a question that essentially asked Sgt. Green to confirm that the victim was at defendant's residence from at least 3:00 a.m. until the police arrived at 1:00 or 2:00 p.m. that afternoon. The State objected on the ground that the question asked Sgt. Green to speculate. Defendant claims he wanted to establish that the victim was there at the time of the attempted car theft and was also there at 8:15 a.m., because Steve Mernin testified that he saw the victim at 8:15 a.m. that morning. Again, defense counsel failed to object to this ruling, so the issue is not preserved for appellate review. Even assuming the issue was preserved for review, and even assuming the trial court erred in sustaining the objection, the error was harmless because the guilty verdict was surely unattributable to any such error. State v. Broadway, 96-2659, p. 24 (La.10/19/99), 753 So.2d 801, 817. Defendant said in his statement that the victim came to his residence at approximately 3:00 a.m. and that she was there at the time of the attempted car theft. Defendant said nothing about the victim leaving at any time prior to the time when police arrived to find the victim bloodied from where defendant had struck her. As previously noted, Sgt. Green confirmed that everything defendant said in his statement was consistent with what he learned during his investigation of the matter. Also, Sgt. Green said there was nothing in his investigation that placed the victim anywhere else but at defendant's residence at 8:15 a.m. that morning. There does not appear to be any doubt or dispute that the victim was at defendant's home from the time she arrived until when police came early that afternoon.
(3) Defendant next complains that the trial court sustained an objection to a question of Sgt. Green as to whether it was true that his report reflected Steve Mernin said that he had seen the victim at 8:15 a.m. Once again, defense counsel failed to object to this ruling, and thus failed to preserve it for review. Even assuming a proper objection, and assuming the objection was erroneously sustained, for the reasons previously discussed any error was harmless.
(4) Defendant's next complaint concerns the sustaining of the State's objection on the ground of speculation when defense counsel asked Sgt. Green whether it was true that a First District homicide detective had learned through his investigation that Steve Mernin had traumatized the victim to such an extent that Mernin was the person the investigation should have been focusing on. Defendant failed to object to this ruling and thus it was not preserved for review. Even assuming the issue was preserved for review, the objection was properly sustained because it sought to elicit a hearsay response. Further, prior to the question Sgt. Green had confirmed that a First District homicide detective was considering that the origin of *160 the homicide was Sauvage Street. There was ample evidence before the jury for it to know that the Sauvage Street connection with the case was that Mernin lived on that street; that the victim was living with Mernin; that the victim was discovered in a coma at Mernin's Sauvage Street apartment on the morning of May 3, 2003; and that it was the defense's position that Mernin had struck the victim and caused an additional injury to her that resulted in the formation of the subdural hematoma that caused her death. Therefore, though the trial court properly denied defendant the right to elicit from Sgt. Green what another homicide detective had learned in that detective's investigation, the answer defense counsel was seeking to elicit was obvious to any rational juror.
(5) Defendant next complains of the sustaining of the State's objection to a question seeking to elicit a confirmation from Sgt. Green that Susan Arruebarrena's testimony (the victim was slammed into the wall on Sauvage Street) was what led the First District homicide detective to think that the case was a First District homicide and that Mernin was the person police should be investigating. Defense counsel failed to object to the ruling, and thus the issue was not preserved for appellate review. Even assuming the issue was preserved for review, the objection was properly sustained because it called for a hearsay response. Moreover, as previously noted, the jury was aware that a First District homicide detective had considered that the homicide originated in the First District because of what might have occurred in Mernin's apartment on Sauvage Street.
(6) Defendant next complains about the sustaining of the State's objection to a question of Sgt. Green as to whether an analysis of fingernail clippings taken from the victim "could have pointed to something, though, possibly?" Sgt. Green had just confirmed that even if Mernin's DNA had been underneath the victim's fingernails it would not have been conclusive because the victim resided with Mernin in Mernin's apartment. Defense counsel failed to object to this ruling and thus failed to preserve the issue for review. The question also called for a response not within Sgt. Green's personal knowledge, which was inadmissible. See La. C.E. art. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter.").
(7) Defendant next complains that the trial court, of its own volition, prevented Sgt. Green from answering the following question: "What did you do as a result of learning about the hostility between those two people [Mernin and the victim]?" The trial court had just stated, as to the State's hearsay objection to another question, that the detective could say what he did as a result of learning of any hostility between Mernin and the victim. Defense counsel then asked the above-quoted question, and the trial court prevented the detective from answering by stating that it was not a proper question and the witness could not testify to that effect. Defense counsel protested on the ground of due process and the right to confront one's accusers. The trial court said it would note an objection for the record. Certainly, what Sgt. Green did would have been admissible as based on his personal knowledge. The answer would have been relevant to defendant's defense that Mernin injured the victim, which injury caused her death.
However, even assuming that the trial court should have permitted Sgt. Green to answer the question, the error was harmless because, as previously discussed, the *161 jury was well aware of the position of the defense that Mernin struck the victim causing the subdural hematoma that led to her death. In addition, Patricia Chaplain, Mernin's sister, had already testified that Mernin had admitted to her that he and the victim used to argue. Mernin had testified that he abused alcohol, that the victim drank a lot and was on methadone, and that the two argued. The jury would later hear Susan Arruebarrena, who lived in the same building as Mernin and the victim, testify that Mernin and the victim were constantly fighting and that Mernin's drunkenness would precipitate the fights. The jury would also hear Arruebarrena testify that she believed Mernin physically abused the victim because she had seen the victim a few times with black eyes and the victim told her who had given them to her, implying that it was Mernin. Further, even assuming Sgt. Green answered the question and had testified, for instance, that as a result of learning of hostility between Mernin and the victim he investigated the possibility that Mernin was responsible for her death, that fact had already been established by Sgt. Green's testimony with regard to a First District homicide detective's suspicions that the homicide might have originated on Sauvage Street. Accordingly, the guilty verdict rendered by the jury in this case was surely unattributable to any error by the trial court in preventing Sgt. Green from answering the question, and thus any such error was harmless. Broadway, supra.
(8) Defendant next complains that the trial court erred in sustaining the State's objection to a hypothetical question by defense counsel as to why, in Sgt. Green's experience, someone alleged to have struck another with a flashlight would be charged with municipal battery instead of aggravated, second-degree or simple battery. The State objected on the ground that Sgt. Green was not the arresting officer, meaning of course that Sgt. Green was not the officer who responded to defendant's residence after he struck the victim with the flashlight. Defense counsel failed to object to this ruling, and thus the issue was not preserved for appellate review. Further, defendant simply argues that the trial court erred in sustaining the objection because it was a hypothetical, and also because Sgt, Green was the lead investigator. Even assuming the answer would have been relevant, the trial properly sustained the objection pursuant to La. C.E. art. 403 on the ground that it was a waste of time, because New Orleans Police Officer Ashish Shah, who actually arrested defendant for the battery on the victim, had already testified on this issue. Officer Shah testified that he could have arrested defendant on state felony offenses of aggravated battery or second degree battery but that because of the circumstances he chose to issue defendant a summons for municipal battery. Therefore, given that this issue was presented to the jury through the testimony of Officer Shah, even assuming the trial court erred in sustaining the State's objection to the hypothetical question of Sgt. Green, the guilty verdict was surely unattributable to any such error, and thus it would have been harmless. Broadway, supra.
(9) Defendant next complains that the trial court erred in sustaining the State's objection, on the ground of speculation, to a question of Sgt. Green as to whether "everything" defendant said was "consistent" with his statement. As with most of the other complaints of error concerning the trial court sustaining the State's objections to defense counsel's questions of Sgt. Green, defense counsel failed to object to the ruling, and thus strictly speaking the issue was not preserved for appellate review. As to the *162 merits, Sgt. Green was being asked about the victim's medical records relative to her head injuries, external and internal, but he also had mentioned that other people had observed dried blood on the victim's head and had noted that obviously there had been some injury to the left side of the victim's head "where the hematoma showed up later." Sgt. Green testified to numerous facts at this point that he had gleaned from several sources during his investigation. Defense counsel's question was vague and overbroad, and an answer by Sgt. Green, either in the affirmative or negative, could easily have misled or confused the jury. It cannot be said that the trial court would have abused its discretion in sustaining the objection pursuant to La. C.E. art. 403. Finally, Sgt. Green replied in the affirmative to a question at one point during his testimony as to whether everything defendant said in his statement was consistent with what the officer later learned in his investigation. Therefore, the question complained of in this instance essentially was repetitive. There is no merit to this claim of error.
(10) Defendant next complains that the trial court erred in sustaining the State's hearsay objection to defense counsel's question of Sgt. Green as to whether he learned of Steve Mernin's drunken rage at the hospital. Again, defense counsel did not object to this ruling and thus, strictly speaking, did not preserve the issue for appellate review. Regardless, that information had already been presented to the jury. Lillian Gittelson, the victim's sister, testified that she learned after the fact that Mernin had been escorted from the hospital at 2:00 a.m. In addition, Mernin himself confirmed on cross examination that he had been drunk at the hospital and was very upset when a physician told him he had to leave because he was not related to the victim. Sgt. Green had no first hand information about Mernin's actions at the hospital, and would have been testifying to hearsay. Considering that the jury had already learned that Steve Mernin was allegedly in a "drunken rage" at the hospital and was asked to leave, the trial court properly sustained the State's objection on the ground that it was a waste of time pursuant to La. C.E. art. 403.
(11) Defendant next complains that the trial court erred in sustaining the State's objection to the question of Sgt. Green as to whether it was true that he had been unable to determine where the incident occurred. This is not entirely accurate. Defense counsel first asked Sgt. Green if it was true that he had stated in his report that he had been unable to determine where the incident occurred. The State objected, but the trial court did not make a ruling. Sgt. Green did not answer the question. Defense counsel then asked Sgt. Green whether it was true that at some point in time he had been unable to determine where the incident occurred. Sgt. Green asked defense counsel if he could show him the location on his report to which defense counsel was referring. Defense counsel pointed out the location on the detective's report, and then asked: "So, isn't it true that both Sgt. St. Germane and Sgt. Bonvillian, two guys, both said that they're not sure where this thing occurred?" The State objected on the ground that counsel was asking Sgt. Green what the other two officers thought about an incident. The trial court sustained the objection. Defendant failed to object, and thus strictly speaking did not preserve this issue for review. However, the trial court properly sustained the objection because the form of the question called for a hearsay response.
(12) Defendant next complains that the trial court sustained the State's *163 objection to counsel's question of Sgt. Green as to whether or not the victim's criminal history affected his belief in her veracity. Defendant argues that the victim's hearsay statements were allowed in during the trial through State witnesses, and therefore the defense was entitled to impeach those statements made by the victim, citing La. C.E. art. 806. Once again, defendant failed to object, and thus did not preserve the issue for review. Regardless, there is no merit to defendant's argument that La. C.E. art. 806 stands for the proposition that defense counsel should have been permitted to attack the victim's credibility by asking Sgt. Green if his research of the victim's criminal record affected his belief that she had not been completely truthful in the statements she made in connection with her complaint that defendant battered her. La. C.E. art. 806 provides that when a hearsay statement has been admitted in evidence the credibility of the declarant may be attacked "by any evidence which would be admissible for those purposes if declarant had testified as a witness." If the victim had testified as a witness in the criminal trial, defense counsel could not have attacked her credibility by a vague and general reference to "her criminal record," but only by evidence of her convictions, pursuant to La. C.E. art. 609.1. State v. Cho, 02-274, pp. 20-23 (La. App. 5 Cir. 10/29/02), 831 So.2d 433, 449-451. Defense counsel in the instant case did not ask Sgt. Green about the victim's convictions. Thus, the trial court properly sustained the objection.
(13) Defendant's last complaint regarding Sgt. Green's testimony is that the trial court erred in overruling defense counsel's objection when the State asked Sgt. Green if domestic violence charged in municipal court was as important as a domestic violence charge in state court. The ground of the objection was that the answer called for an opinion of law. However, on appeal defendant argues that the question was improper because it was irrelevant, and makes no argument with regard to the ground upon which defense counsel based his contemporaneous objection at trial. La.C.Cr.P. art. 841(A) requires that a defendant make known the grounds for his objection, and he is limited on appeal to those grounds articulated at trial. State v. Brooks, 98-0693, p. 9 (La. App. 4 Cir. 7/21/99), 758 So.2d 814, 819; see also State v. Dean, XXXX-XXXX, p. 8 (La.App. 4 Cir. 3/14/01), 789 So.2d 602, 607 ("As the defendant's argument on appeal is different from his basis for objecting at trial, the defendant is precluded from raising the issue on appeal."). Defendant is precluded from raising the issue of relevance to Sgt. Green's testimony with regard to this assignment of error because it was not the ground for his objection at trial. He makes no argument as to the ground asserted at trial.
There is no merit to any part of this assignment of error.

ASSIGNMENT OF ERROR NO. 4
In this assignment of error, defendant argues that the State made a prejudicial comment while making an objection during the cross examination of Sgt. Green. Defense counsel asked Sgt. Green whether it was true that the municipal summons was the lowest form of battery with which one could be charged. The officer replied in the affirmative, and defense counsel followed by stating:
"Q. And some people say it is not a battery, it's a summons?"
The prosecutor objected, stating:
"Objection, Your Honor, to not a battery. It's by definition a battery. It is a battery." (Id.).
*164 The trial court overruled the prosecutor's objection, and defense counsel proceeded with his cross examination of Sgt. Green, without making any objection to the comment by the prosecutor that defendant now argues on appeal was improper and prejudicial. Defense counsel failed to preserve for review any claim of error as to the prosecutor's comment because he failed to make a contemporaneous objection thereto. La.C.Cr.P. art. 841(A); State v. Seals, 95-0305, p. 5 (La.11/25/96), 684 So.2d 368, 373, grant of post conviction affirmed on other grounds, State ex rel. Seals v. State, 2000-2738 (La.10/25/02), 831 So.2d 828; State v. Spain, 99-1956, p. 11 (La.App. 4 Cir. 3/15/00), 757 So.2d 879, 886.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 5
In this assignment of error defendant argues that the trial court erred in allowing both prosecutors to share in the examination of two State witnesses. More specifically, defendant complains that during prosecutor Rhonda Goode's examination of Stephanie Brisco fellow prosecutor Kelly Rish repeatedly answered defense counsel's objections. Prosecutor Rish also made objections during defense counsel's cross examination, even after defense counsel objected to such procedure and the trial court called counsel into chambers. Once the trial court cautioned the prosecutors on the record, it did not happen again during Ms. Brisco's testimony. Prosecutor Rish later made one objection during defense counsel's cross examination of Officer Ashish Shah, who prosecutor Goode had examined on direct. Defense counsel did not object to this incident, and thus cannot complaint of it. La. C.C.P art. 841(A).
La. C.E. art. 611 states that the trial court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to, inter alia, make the interrogation and presentation effective for the ascertainment of the truth and avoid needless consumption of time. Defendant cites no authority at all in this assignment of error. Defendant's claim of prejudice is that this activity by prosecutors gave the State an "unfair advantage" over the defense. Even assuming arguendo that these actions by the prosecutors constituted error, such error was harmless because the guilty verdict rendered in this trial was surely unattributable to the error. State v. Snyder, 98-1078, p. 15 (La.4/14/99), 750 So.2d 832, 845.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 6
In this assignment of error defendant argues that the trial court erred in admitting photographs of the victim taken in the hospital and during her autopsy. Defendant contends that photographs taken of the victim in the hospital were taken after the victim had brain surgery and was in a "severely altered" condition that she had not been in after being struck by defendant. The hospital photos showed the victim in a hospital bed with a ventilator tube inserted in her mouth and bandages wrapped around her head that had absorbed blood from surgical incisions. Those photographs also showed the victim's bruised and swollen left eye. Defendant also complains that the autopsy photos shown to the jury depicted incisions made to the victim's wrists, that any bruising to her wrists was never alleged to have caused her death, and thus that such photos were purely gratuitous and inflammatory.
The state is entitled to the moral force of its evidence, and postmortem *165 photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing the cause of death, the location and placement of wounds, and to the positive identification of the victim. State v. Koon, 96-1208, p. 34 (La.5/20/97), 704 So.2d 756, 776, citing State v. Watson, 449 So.2d 1321, 1326 (La.1984) and State v. Kirkpatrick, 443 So.2d 546, 554-555 (La.1983). Photographic evidence will be admitted unless it is so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. Koon, supra, citing State v. Perry, 502 So.2d 543, 558-559 (La.1986).
In the instant case, Dr. Liuzza, who performed the autopsy on the victim's body, testified to the significance of the photographs depicting the inside of the victim's wrists and the left side of her arm. He said they showed bruising under the skin, and confirmed such bruising would be consistent with someone holding someone down by the wrist or arms or handcuffing someone. Defendant testified that he and his female housemate had tried to restrain the victim and place plastic handcuffs on her. Thus, these photographs were relevant. As to the post-operative photographs of the victim unconscious in her hospital bed following brain surgery to remove the hematoma pressing on her brain, Dr. Liuzza conceded during defense counsel's cross examination of him that a lot of blood on the bandage around the victim's head was the result of the brain surgery. However, Dr. Liuzza testified on direct examination that he found no evidence that the surgery caused the bruising and swelling around the victim's left eye, as depicted in the post-operative photographs. Thus, those photographs were relevant to show the result of defendant striking the victim.
The photographs complained of were relevant, and it cannot be said that they were so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. Accordingly, there was no error in admitting them into evidence.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 7
In this assignment of error, defendant complains that in charging the jury the trial court gave a battery charge at the beginning of the charge, and then, at the conclusion of the charge "repeated the definition of battery." Defendant complains that this latter definition of battery was the last thing the jury heard before retiring to deliberate and that it unfairly impacted him.
Defendant erroneously represents that the trial court "repeated" the battery charge. In the first charge, the trial court simply defined battery in general as it is defined in La. R.S. 14:33. In the latter charge, made after a discussion off the record between counsel and the trial judge, the trial court specifically defined simple battery, La. R.S. 14:35, and aggravated battery, La. R.S. 14:34.
Further, defendant failed to object when the trial court gave the charges as to simple and aggravated battery. Generally, "[a] party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error." La.C.Cr.P. art. 801. Appellate review of this error is also precluded by the failure to make a contemporaneous objection as required by La.C.Cr.P. art. 841(A). State v. Chisolm, 95-2028, p. 7 (La.App. 4 Cir. 3/12/97), 691 So.2d 251, 255.
*166 Defendant is precluded from raising this issue on appeal and, moreover, there appears to have been no error in the trial court's action.

ASSIGNMENT OF ERROR NO. 8
In this assignment of error, defendant complains that his thirty-year sentence as a third-felony habitual offender is unconstitutionally excessive given what defendant characterizes as the lack of evidence in his case as well as the fact that the prior convictions upon which his habitual offender sentence was imposed were both drug offenses.
Defendant was convicted of manslaughter. The sentence prescribed for manslaughter, under the circumstances of defendant's case, was imprisonment at hard labor for not more than forty years. Pursuant to La. R.S. 15:529.1(A)(1)(b)(i), as a third-felony habitual offender, defendant was subject to a minimum sentence of twenty-six years and eight months at hard labor and a maximum of eighty years.
La. Const. art. I, § 20 explicitly prohibits excessive sentences; State v. Baxley, 94-2982, p. 4, (La.5/22/95), 656 So.2d 973, 977. Although a sentence is within the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment. State v. Brady, 97-1095, p. 17 (La.App. 4 Cir. 2/3/99), 727 So.2d 1264, 1272, rehearing granted on other grounds, (La.App. 4 Cir. 3/16/99); State v. Francis, 96-2389, p. 6 (La.App. 4 Cir. 4/15/98), 715 So.2d 457, 461, grant of post conviction relief on other grounds affirmed, XXXX-XXXX (La.App. 4 Cir. 2/6/02), 809 So.2d 1132. However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society. Baxley, 94-2984 at p. 10, 656 So.2d at 979, citing State v. Ryans, 513 So.2d 386, 387 (La.App. 4 Cir.1987). A sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Johnson, 97-1906, pp. 6-7 (La.3/4/98), 709 So.2d 672, 677; State v. Webster, 98-0807, p. 3 (La.App. 4 Cir. 11/10/99), 746 So.2d 799, 801, reversed on other grounds, State v. Lindsey, 99-3256 (La.10/17/00), 770 So.2d 339. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. Baxley, 94-2984 at p. 9, 656 So.2d at 979; State v. Hills, 98-0507, p. 5 (La.App. 4 Cir. 1/20/99), 727 So.2d 1215, 1217.
The thirty-year sentence imposed on defendant is two years and four months longer than the minimum statutory sentence. As a practical matter, defendant received the minimum sentence under the Habitual Offender Law.
In State v. Lindsey, 99-3256 (La.10/17/00) 770 So.2d 339, the Louisiana Supreme Court held that to rebut the presumption that the mandatory minimum sentence is constitutional, the defendant must show by clear and convincing evidence that he is exceptional, which in this context means that because of unusual circumstances he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. 99-3256, p. 5, 770 So.2d at 343; see also State v. Johnson, 97-1906, pp. 6-7 (La.3/4/98), 709 So.2d 672, 677. "Departures downward from the minimum sentence under the Habitual Offender Law should occur only in rare situations." Johnson, 97-1906 at p. 9, 709 So.2d at 677.
The two predicate convictions upon which defendant's adjudication as a third-felony habitual offender was based were a *167 1994 conviction from Jefferson Parish for acquiring or obtaining possession of a controlled dangerous substance by fraud or deceit and a 2000 conviction from Orleans Parish for possession of cocaine. Part of the plea agreement from the 2000 conviction was that the district attorney would not charge defendant as a habitual offender.
Defendant, whose date of birth is October 11, 1953, had a criminal record dating to January 1973, when he was arrested for possession of marijuana. That charge was refused. In 1976 defendant was convicted of felony theft in Aspen, Colorado. Later that year defendant was convicted of being a "Peeping Tom" in Baton Rouge, Louisiana. In 1977 defendant was charged with distribution of barbiturates and possession of marijuana and cocaine. The former charges were dismissed, and defendant was convicted of possession of cocaine. After a thirteen-year hiatus, defendant was arrested for theft in 1990, a charge later dismissed. In 1993, defendant was charged on three separate occasions with obtaining a controlled dangerous substance by fraud, twice in Jefferson Parish and once in Pensacola, Florida. One case in Jefferson Parish was dismissed, and in the other defendant pleaded guilty and received a suspended sentence with two years probation. Defendant was placed on three years probation in the Florida case, with adjudication withheld. Excluding the three 1993 charges for obtaining controlled dangerous drugs by fraud, from 1993 until his arrest in the instant case almost ten years later defendant was charged with a total of twenty crimes, including carrying an open container, possession of drug paraphernalia, disturbing the peace, criminal trespass, municipal theft, simple battery, first and second offense possession of marijuana, three separate counts of possession of cocaine, possession of stolen property, resisting arrest, and possession of a firearm as a convicted felon and while in possession of drugs. Only two convictions resulted from these offenses for which defendant was arrested during that ten-year periodone for first offense possession of marijuana and one for possession of cocaine. The handful of defendant's convictions resulted in only one non-suspended sentence of imprisonment, and that was a sentence of two days in Orleans Parish Prison on the first offense possession of marijuana conviction in 2000.
This court in the past has affirmed many lengthy sentences imposed on drug abusers sentenced as habitual offenders based entirely on drug convictions, including mandatory life sentences imposed on certain third-felony habitual offenders before the 2001 amendments to the Habitual Offender Law. In the instant case, the defendant, clearly a person with a drug addiction problem, was sentenced as a habitual offender based not only his predicate convictions for drug offenses, but also for the instant offense, the killing of a fellow drug addict, a guest in his residence, who allegedly was attempting to steal drugs and jewelry from him. That defendant's two predicate convictions were "simply" drug offenses does not serve to render his sentence unconstitutionally excessive. That is, it cannot be said that the sentence essentially the minimum statutory sentencemakes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime.
There is no merit to this assignment of error.
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Chaplain referred to Rocky's last name as Perez during her testimony. However, the evidence is that the last name was Ruiz.
[2] La. R.S. 14:20 states:

A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
(2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.
(3) When committed against a person whom one reasonably believes to be likely to use any unlawful force against a person present in a dwelling or a place of business, or when committed against a person whom one reasonably believes is attempting to use any unlawful force against a person present in a motor vehicle as defined in R.S. 32:1(40), while committing or attempting to commit a burglary or robbery of such dwelling, business, or motor vehicle. The homicide shall be justifiable even though the person does not retreat from the encounter.
(4)(a) When committed by a person lawfully inside a dwelling, a place of business, or a motor vehicle as defined in R.S. 32:1(40), against a person who is attempting to make an unlawful entry into the dwelling, place of business, or motor vehicle, or who has made an unlawful entry into the dwelling, place of business, or motor vehicle, and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the premises or motor vehicle. The homicide shall be justifiable even though the person committing the homicide does not retreat from the encounter.
(b) The provisions of this Paragraph shall not apply when the person committing the homicide is engaged, at the time of the homicide, in the acquisition of, the distribution of, or possession of, with intent to distribute a controlled dangerous substance in violation of the provisions of the Uniform Controlled Dangerous Substances Law.