ROLAND L. BELSOME, Judge.
|TOn June 11, 2007, Robin Malta was discovered bludgeoned to death in his apartment at 634 Port Street in New Orleans. Subsequently, the defendant, Mark Ott, was charged with second-degree murder in the death of Mr. Malta. At his arraignment, the defendant pled not guilty.
During a four day trial, the jurors heard testimony from investigators involved in the case, experts, and lay witnesses. At the conclusion of the trial, the jury returned a verdict of guilty, with ten jurors finding the defendant guilty as charged and two finding him guilty of manslaughter. Following the verdict, the defendant filed Motions for New Trial and for Post-Verdict Judgment of Acquittal, which the trial court denied. The trial court sentenced the defendant to life imprisonment without benefit of probation, parole or suspension of sentence. This appeal followed.
*1282 On appeal the defendant raises four issues that he asserts warrant a reversal of the conviction and/or a new trial: 1) the evidence was insufficient to prove guilt beyond a reasonable doubt; 2) improper statements were made by the State during closing arguments; 3) he had ineffective assistance by counsel; and 4) a non-unanimous jury verdict violates his Sixth Amendment rights.
| ¡.First, the defendant contends that the evidence produced at trial was insufficient for a jury to find guilt beyond a reasonable doubt. At trial, the jury was presented with witnesses that recounted the events leading up to the discovery of Mr. Malta’s body. Those witnesses included William Panter, the victim’s landlord and next door neighbor, the victim’s sister, Monica Malta, and his friend and employee, Mark Kinsell. These three witnesses discovered Mr. Malta’s body and contacted the police. Mr. Kinsell testified that he grew concerned when he arrived for work at Salon D’Malta and found it in disarray.[1] He described the condition of the salon as having a mirror on the floor, chairs out of order, hair clippings on the floor with the victims’ trimmers, clippers and shears. There were also beer bottles, cigarette butts and shot glasses on the floor. Ms. Malta and Mr. Kinsell both acknowledged that this was out of the ordinary, as Mr. Malta was very meticulous about the condition of the salon.
Other witnesses that testified included the defendant’s co-workers from his employment as a deckhand with Turn Services in New Orleans. Those witnesses established dates in which the defendant applied for employment, interviewed and actually worked at Turn Services.[2] Additionally, one of the co-workers testified that he often picked the defendant up and dropped him off at hotels and motels around the French Quarter. Those witnesses established the defendant’s whereabouts in New Orleans on or around the date of Mr. Malta’s murder in contrast to Mr. Ott’s initial statements that he only came to the city to party.
Also testifying at trial were numerous investigators and experts that participated in the investigation of the murder. John Gagliano was the chief [¡¡investigator for the Orleans Parish Coroner’s Office and acted as the liaison between the coroner’s office and state pathologist in connection with the investigation into the murder of Mr. Malta. Mr. Gagliano photographed the crime scene and the deceased and compiled a report of his findings for the coroner. When he arrived at the scene, he observed the victim lying face down on his bed. Mr. Gagliano remembered that the apartment was very hot because the kitchen stove had been turned on full blast, and the oven door was open. He surmised that it appeared as if someone was trying to set the premises on fire to cover up a crime. There was a sticky substance on the floor and on the victim’s body which Mr. Gagliano opined was a fire accelerant. After obtaining information about the victim and taking photos of the scene, he turned the body over and noted injuries and a sexual object, stuck in the victim’s mouth. Mr. Gagliano further noted that there were no signs of forced entry into the apartment.
Detective Erbin Bush of the New Orleans Police Department arrived at the *1283 victim’s residence and noted that EMS personnel and NOPD support units were already on site. Detective Bush identified photographs documenting the appearance and condition of the Port Street residence at the time of his arrival. He confiscated several items from the crime scene all of which were deposited in Central Evidence and Property for testing. None of the items collected produced physical evidence that lead to a suspect.
NOPD Crime Lab Director Anna Dug-gar testified by stipulation as an expert in blood spatter analysis, collection of evidence, blood testing, serology and development of latent prints. Ms. Duggar explained to the court that she visited the |4crime scene on June 14, 2007, to inspect and photograph the scene. She identified the photographs she took and further stated that she observed blood stains/spatter patterns on the living room wall, the door between the living and bedroom, the floor in front of the bedroom door and an orange paint bucket. Ms. Duggar opined that the victim was hit in the head multiple times in the living room, while he was seated on a bench, but she could not say what object was used to hit the victim. She also theorized that the victim was pulled from the bench onto the carpeted floor where he left a pool of blood. Judging from the volume of the blood on the orange paint bucket, Ms. Duggar theorized that the victim’s assailant put the bucket over the victim’s head as the victim was dragged into the bedroom.
NOPD Officer Derrick Melder, a member of the NOPD Crime Lab, collected evidence from and photographed the crime scene on June 13, 2007. His report indicated that after he photographed the scene, he collected two wooden hammers from the kitchen of the victim’s residence.[3] He was later called back to the scene to collect items that had been discovered by Nate Burgess who worked for a crime scene cleanup business called Clean Scene.[4] An additional report was made pursuant to his June 22, 2007, visit to the crime scene reflecting the three pieces of a cell phone and a smoke detector that was discovered on that date. The smoke detector was identified as the exact make and model the landlord had installed in Mr. Maker’s apartment.
Detective Decynda Barnes, an NOPD homicide detective, testified that she became involved in this investigation in August 2007 when she read the report of her predecessor in this case. She learned that blood samples were collected during pthe investigation of this case, and she obtained swabs of the samples and sent them to the State Police Crime Lab for DNA analysis. The first swab was from a smoke detector which tested positive for human blood. The detective explained that the swab from the smoke detector resulted in an identification by CODIS.[5] Based on the CODIS hit for the defendant, Detective Barnes obtained the defendant’s state identification number and prepared a warrant for his arrest.
The arrest warrant was signed on July 18, 2008. Barnes located the defendant in the Albany, Louisiana jail. On July 80, 2008, the detective travelled to Albany and *1284 after advising the defendant of his Miranda rights escorted him to Orleans Parish. On the way, Detective Barnes asked the defendant if he knew the victim or had ever come to New Orleans. The defendant denied knowing the victim or anyone from the city and said he only came to New Orleans on occasion to party. She then asked the defendant if he had ever been inside of 634 Port Street, and again he said no. The defendant then asked Detective Barnes whether the police had any DNA evidence. The detective replied that the DNA the police had was a mixture of his and the victim’s blood located at the crime scene. The defendant said he asked the question because his girlfriend was a nurse. Later during the conversation, the detective learned that the defendant was married with two children and also had a girlfriend. When the detective asked the defendant if he had ever had his hair cut in New Orleans, he responded that he had two haircuts but could not remember the name of the salons.
Upon returning to New Orleans Detective Barnes obtained a warrant to obtain buccal swab from the defendant for comparison with the sample held at the | fiState Police Crime Lab. That sample was tested against the blood swab taken from the smoke detector to develop likelihood ratio statistics.
On appeal, the defendant contends that the evidence presented was insufficient to support his conviction. He offers two arguments to support this assertion: first, the evidence was too uncertain to establish beyond a reasonable doubt that the DNA found on the smoke detector in the victim’s apartment was his; second, even assuming the jury reasonably concluded that the DNA belonged to him, the evidence was still legally insufficient to prove his guilt beyond a reasonable doubt.
Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), set forth the constitutional standard for testing the sufficiency of the evidence requiring that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged beyond a reasonable doubt. State v. Carmouche, 508 So.2d 792, 799 (La.1987). Often, circumstantial evidence is used to prove the commission of the offense. Id. Under those circumstances, the circumstantial evidence rule provided by La. R.S. 15:438 mandates that “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” Id. That rule does not conflict with the Jackson standard. “[A]ll evidence both direct and circumstantial must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden.” Id. (citing State v. Garcia, 483 So.2d 953 (La.1986); State v. Porretto, 468 So.2d 1142 (La.1985); State v. Wright, 445 So.2d 1198 (La.1984)).
It is not the function of an appellate court to assess credibility or reweigh the evidence. State v. Hebert, 2000-1052, p. 12 (La.App. 4 Cir. 4/11/01), 787 So.2d 1041, 1050 (citing State v. Smith, 600 So.2d 1319, 1324 (La.1992)). Credibility determinations are within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence. Id. Therefore, “absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness’s testimony, if believed by the fact finder, is sufficient to support a factual conclusion.” State v. Marshall, 2004-3139, p. 9 (La.11/29/06), 943 So.2d 362, 369 (citing State v. Legrand, 864 So.2d 89, 94 (La. *1285 2003)). A trier of fact’s determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence. State v. Vessell, 450 So.2d 938, 943 (La.1984).
In order to obtain a conviction, the State must prove the elements of the crime charged beyond a reasonable doubt. Jackson, supra. The defendant in this case was convicted of second degree murder, defined in pertinent part by La. R.S. 14:30.1 as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm, or when the offender is engaged in the perpetration or attempted perpetration of, among other felonies, armed robbery or simple robbery.
Specific criminal intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Specific intent need not be proven as fact, but may be inferred from the circumstances and actions |sof the defendant. State v. Hebert, 2000-1052, p. 12, 787 So.2d 1041, 1050. The intent to kill or to inflict great bodily may be inferred from the extent and severity of the victim’s injuries. State v. Lawson, 08-123, p. 7 (La.App. 5 Cir. 11/12/08), 1 So.3d 516, 522.
There is no dispute that the victim was beaten to death in his home. The defendant maintains that the jury was unreasonable in reconciling Ms. Herndon’s contradictory testimony that the initial DNA match against his CODIS profile excluded only 80.5% of the population as contributors to the smoke detector sample, but that the defendant was ultimately determined to be at least 14.3 million times more likely than another random person to have contributed to it. As such, the defendant argues that Ms. Herndon’s testimony is internally contradictory or irreconcilable with physical evidence and legally insufficient to sustain the jury’s factual finding that the DNA found in the victim’s bedroom belonged to him. Further, he maintains that absent DNA evidence, the remaining circumstantial evidence was insufficient to link him to the murder and for any reasonable trier of fact to have found that the State established his guilt beyond a reasonable doubt.
The defendant mischaracterizes Ms. Herndon’s testimony regarding her DNA analysis results and suggesting that the rate of exclusion and likelihood ratios are necessarily contradictory and mutually exclusive, such that no reasonable trier of fact could have reconciled them in favor of finding that the DNA proved his presence in the victim’s apartment. The defendant also construes the 17.5% non-exclusion rate and the 14.3 million-to-one likelihood ratio as both pertaining to the chances that another person beside himself could have contributed to the blood sample found on the victim’s smoke detector based on the 12-out-of-13 loci DNA match obtained by the Louisiana State Police lab. The defendant contends it is | ^mathematically impossible for a profile that cannot exclude one-fifth of the world’s population (roughly 1.3 billion people) to exclude everyone but him in all but one of the 14.3 million random analyses.
Ms. Herndon testified on cross-examination that those two figures are entirely unrelated and that one does not negate the other. The defendant is correct that the likelihood ratio of at least 14.3 million-to-one relates to the chances that another random person with the same overall genetic profile as the defendant — adjusting for allelic dropout — could have contributed to the mixture sample deposited on the smoke detector. However, the 17.5% non-exclusion rate does not also relate to the *1286 tested profile as a whole but rather relates to the likelihood that another random person could have contributed the same single missing allele in the mixture sample that was initially matched to the defendant through CODIS. For that reason, Ms. Herndon testified that it is necessary to take the entire profile into account in assessing whether the defendant could be excluded as a contributor because it was against protocol to exclude a subject based on the 17.5% chance that someone else may have contributed a single dropped allele.
We cannot find that the jury was unreasonable in accepting Ms. Herndon’s expert testimony that allelic dropout is a generally accepted and not uncommon scientific phenomenon. Given that the defendant’s buccal swab was a perfect DNA match with the smoke detector sample at all 12 remaining loci, the jury was reasonable in inferring, based on reason and common sense, that the dropped allele in that sample in all likelihood also matched the defendant, and that the 14.3 million-to-one likelihood that someone other than the defendant contributed to the mixed sample found in the victim’s apartment was valid and established the defendant’s presence in the apartment beyond a reasonable doubt.
|inThe defendant further argues that even if there was a trace amount of his DNA on the smoke detector, that finding is still not sufficient to establish that he committed the murder. He contends that it was possible that he had gotten his hair cut at the victim’s salon, and thus it is also possible that his DNA could have been dispersed through every hair follicle and microscopic scraping of skin released by a comb or clippers that were used on him. The defendant suggests that his DNA would “rain down” over the hands, clothes, and shoes of the person cutting his hair. He further argues that if the person who cut his hair was the victim, he could have easily carried a microscopic amount of the defendant’s DNA into his house and then deposited it on the smoke detector when he changed the batteries, or he could have deposited the DNA onto the hands of the murderer, who then transferred it to the smoke detector.
Confronted with competing accounts of how the defendant’s DNA ended up in the victim’s bedroom, the jury chose to believe the State, and this Court is not in a position to second guess the jury’s conclusion.
Also relating to the DNA evidence in this case is the defendant’s second issue raised on appeal. The defendant claims that he received ineffective assistance of counsel because his attorney failed to call defense expert Dr. Laurence Mueller, who would have exposed the State’s flawed testing/analysis and would have testified that in his opinion the defendant’s DNA profile actually excluded him as a contributor to the blood mixture found on the smoke detector in the defendant’s bedroom. Hence, the defendant contends that counsel’s mistake deprived him of “a powerful weapon with the obvious capacity to undermine, if not wholly devastate, the State’s DNA evidence.”
JjjThe preferred procedure for addressing claims of ineffective assistance of counsel is a post-conviction proceeding in the trial court, not on appeal. State v. Watson, 00-1580, p. 4 (La.5/14/02), 817 So.2d 81, 84 (citing State v. Deloch, 380 So.2d 67, 68 (La.1980)). Raising the issue in a post-conviction procedure provides for a full evidentiary hearing to be conducted to explore the issue. Id. (citing State v. Stowe, 93-2020 (La.4/11/94), 635 So.2d 168; Deloch, 380 So.2d at 68 (La.1980)).
For a defendant to be successful in a claim of ineffective assistance of coun *1287 sel, he must show that counsel’s performance was deficient and that he was prejudiced by the deficiency. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 687 (1984). Counsel’s performance is ineffective when it can be shown that he made errors so serious that counsel was not functioning as the “counsel” guaranteed to the defendant by the Sixth Amendment. Id. Counsel’s deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant “must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Id.
Initially, the defense counsel in this case filed a pre-trial motion in limine to exclude the State’s DNA evidence entirely and was granted a contradictory hearing by the district court in which that motion, accompanied Dr. Mueller’s affidavit, was considered and ultimately denied by the court opining that cross-examination was the proper avenue for the defense to test the State’s testing procedures and conclusions. At some point, counsel determined that cross-examination alone l^would be sufficient to refute Ms. Herndon’s findings; and Dr. Mueller was not subpoenaed.
The defendant must now show that he was denied a fair trial due to his counsel’s decision not to subpoena or call Dr. Mueller. Whether Dr. Mueller’s credentials as an expert in DNA, his factual conclusions, and critique of Ms. Herndon’s conclusions would have swayed a jury had he been called to testify, is an issue that warrants a full evidentiary hearing. Given the substantial weight of the DNA evidence in this case, this Court does not find that the record provides adequate information to properly explore the issue. This assignment of error would better be addressed in a post-conviction proceeding.
Next, the defendant asserts that certain statements made during the State’s closing arguments were untrue and were prejudicial to the defendant. More specifically, the defendant complains that the district attorney violated his due process right to a fair trial during the State’s rebuttal closing argument when he falsely represented to the jury that the defendant’s uninformed knowledge of certain investigative facts proved his guilt.[6]
The defendant concedes that “[djefense counsel did not immediately object to this argument,” but nonetheless asserts that this issue was preserved by its inclusion as a basis for his post-verdict motion for new trial, and asks this Court to consider the merits thereof. Alternatively, the defendant asks this Court to find that his counsel was ineffective for failing to timely object to the district attorney’s comments.
|!SA defendant cannot avail himself of an alleged error unless he made a contemporaneous objection at the time of the error. La.C.Cr.P. art. 841(A); State v. Cuccia, 2005-0807, p. 34 (La.App. 4 Cir. 3/15/06), 933 So.2d 134. Not only does an objection have to be made, but La.C.Cr.P. art. 841(A) requires that a defendant make known the grounds for his objection, and he is limited on appeal to those ground articulated at trial. State v. Brooks, 98-0693, p. 9 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 819. Objections to remarks of the district attorney in closing argument must be made at that time and not after *1288 conviction in a motion for a new trial. State v. Batiste, 318 So.2d 27, 36 (La.1975). By not objecting, defendant has failed to preserve this issue for review.
Further, as discussed above, an ineffective assistance of counsel claim is more appropriately addressed at a full evidentia-ry hearing on post-conviction relief. This argument should be presented together with the argument regarding Dr. Mueller not being called as a witness.
In the defendant’s final assignment, the defendant argues that his conviction by a non-unanimous twelve-person jury violates his due process rights. The defendant herein was convicted of second-degree murder by a vote of 10 to 2.[7]
Louisiana Constitution Article I, § 17(A) provides that a case “in which the. punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict.” Additionally, La.O.Gr.P. art. 782(A) provides in part that “[cjases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.”
In Apodaca v. Oregon, 406 U.S. 404, 410-11, 92 S.Ct. 1628, 1632-33, 32 L.Ed.2d 184 (1972) the United States Supreme Court specifically stated that there is no requirement of unanimity to convict or acquit. Id. More recently, this Court in State v. Boudreaux, 2008-1504 (La.App. 4 Cir. 9/29/10), 48 So.3d 1144, discussed the long standing jurisprudence and referenced the Louisiana Supreme Court’s opinion in State v. Bertrand, 2008-2215 (La.3/17/09), 6 So.3d 738. In Bertrand, the trial court found that La.C.Cr.P. art. 782(A) violated the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, relative to the number of jurors needed to concur to render a verdict in cases in which punishment is necessarily confinement at hard labor, the same issue raised by the defendant in the instant case. On direct appeal by the State, the Louisiana Supreme Court reversed, stating that under current jurisprudence from the United States Supreme Court, non-unanimous twelve-person jury verdicts are constitutional; and therefore La.C.Cr.P. art. 782(A) is constitutional.
For the foregoing reasons, the defendant’s conviction and sentence is affirmed. Furthermore, his claims for ineffective assistance of counsel are relegated to post-conviction relief.
AFFIRMED

. The victim owned Salon D’Malta located at 1233 Decatur Street, New Orleans.

. The defendant applied for and interviewed for the deck hand job on June 8, 2007. The defendant signed a "Pre Employment Agreement” on June 12, 2007 and began his employment at Turn Services on June 17, 2007. His employment was terminated on February 12, 2008.

. These items did not provide any conclusive evidence.

. The smoke detector was the one piece of physical evidence that linked the defendant to the crime. The defendant does not challenge the collection of the evidence, only the validity of the analysis of the DNA.

.CODIS is an acronym for the combined DNA index system where criminals' DNA is kept on record. The system was designed by the FBI and supplied to the state for identification of DNA samples.

. Because this Court is not addressing the substance of this assignment of error the statements complained of have not been included in the opinion.

. Two of the jurors voted in favor of a manslaughter verdict.