JAMES F. McKAY III, Chief Judge.
hln this criminal appeal, the defendant, Thaddeus Ross, seeks review of his conviction and sentence for second degree murder. For the reasons that follow, we affirm his conviction and sentence.
PROCEDURAL HISTORY:
The defendant was charged with one count of second degree murder pursuant to La. R.S. 14:30.1. On February 27, 2015, a jury returned a verdict finding the defendant guilty as charged. After denying the defendant’s motion for new trial, the trial court sentenced the defendant to life in prison without the benefit of parole, probation, or suspension of sentence, with credit for time served, to run concurrently with any other sentence. This timely appeal followed.
FACTS:
The instant offense arises out of a shooting that occurred at approximately 1:25 p.m. in the 800 block of Felicity Street near the River Garden Apartments on February 14, 2011. The deceased victim, Lewis Cook (aka “Louchie”), as well as his friends, Thomas Riles (aka “Ray-Ray”), Corey Jackson (aka “Co-slim” or “Cool Slim”), Rolshonda Meyers (aka “Shony”), Rolnesha Meyers (aka “Roady”), and her infant daughter were standing on the corner prior to the incident. |2Rolshonda Meyers left her daughter with Corey Jackson as she went across the street to.her cousin’s house.
Shortly thereafter, a white sedan, or town car, with three to four occupants drove by with the windows rolled down and stopped in front of Lewis Cook and his friends. The two individuals seated on the front and rear passenger side of the vehicle, identified later as the defendant (aka “Lil Man”) and Tony Lacour (aka “Yayo”), fired numerous shots towards the group. The vehicle then sped off. The driver of the car was later identified as Jamal Phillips (aka “Chicken”).[1]
Lewis Cook was shot four times; he died in the hospital at approximately 4:59 p.m. Thomas Riles was shot in the arm; Rolnesha Meyers was shot in the foot; Corey Jackson was shot in the back; the infant was shot in the leg. They all survived the shooting. Corey Jackson testified that prior to the shooting he saw Caswand Justina Winding, the defendant’s girlfriend and mother of his child, in the neighborhood. She warned him and Lewis Cook to “be careful out here, my baby daddy ... riding around here.” Rolnesha Meyers also testified that Caswand Winding warned her to be careful.
Detective Wayne DeLarge of the Sixth District Investigative Unit of the NOPD responded to the call from dispatch to investigate the scene. He testified that when he arrived, he observed Lewis Cook lying in the driveway between apartments. EMS was already on the scene rendering aid to Lewis Cook and preparing him for transport to the hospital. Corey Jackson was in grave condition and unable to speak. The crime lab technicians photographed the scene and collected evidence, which included bullet casings and blood samples. The crime 13lab recovered twen *1214 ty spent bullet casings of nine millimeter caliber and two spent bullets.
A loaded nine millimeter semiautomatic handgun was also found at the scene inside of an ice chest near where Cory Jackson was lying. It was later discovered that the firearm in the ice chest belonged to the deceased victim, Lewis Cook. Meredith Acosta, a firearms examiner for the Crime Laboratory of the NOPD and an expert in the field of firearms and tool marking identifications, testified that the firearm found in the ice chest was not used in the shooting. She further opined that based on the casings and projectiles recovered from the crime scene, probably two separate weapons were used at the shooting.
After investigating the scene, Det. De-Large relocated to the hospital in an attempt to conduct interviews. When he arrived, he learned that Lewis Cook had succumbed to his injuries. Det. DeLarge was also unable to speak with Corey Jackson because he was in surgery. Det. De-Large testified that he interviewed twelve individuals that he believed were on the scene the day of the shooting or had information about the shooting, but that investigation did not yield any witnesses.
After Lewis Cook died, the investigation was turned over to the Homicide Division of the NOPD. Detective Robert Long of the Homicide Division was assigned to be the lead detective. He spoke with the detectives who had investigated the crime scene and reported to the hospital. At the hospital, Det. Long spoke with Thomas Riles, Cory Jackson, Rolnesha Meyers, Rolshonda Meyers, and Lewis Cook’s mother, Patricia Cook, but did not take any statements at the time.
|4In the course of his investigation, Det. Long developed the defendant as a suspect in the shooting. On February 17, 2011, Det. Long and two other officers, Det. Ryan Aucoin and Det. Michael McCleary, returned to the hospital and took the recorded statement of Cory Jackson. Det. Long presented Cory Jackson with a six-person line-up, which included the defendant. Cory Jackson was not able to make an identification. Det. Long also presented the photographic lineup to Thomas Riles, who also was unable to make an identification. Det. Long attempted to interview Rolnesha Meyers, but she refused to meet with the detectives.
Det. Long later interviewed the defendant’s girlfriend, Caswand Winding, after receiving information that she was present at the scene, either shortly before or shortly after the shooting. Det. Long and Det. McCleary took her recorded statement on February 17, 2011.[2]
Caswand Winding stated that she observed the defendant with Jamal Phillips in the neighborhood near the River Garden Apartments on the day of the shooting riding in a white town car. She stated that the defendant had asked her earlier that day who was around the neighborhood because there was a “beef’ between the Tenth Ward and Twelfth Ward. Caswand Winding admitted that she warned Corey Jackson just prior to the incident to be careful because the defendant was coming into the neighborhood. She confirmed that some of the victims who were shot belonged to a group that the defendant was “beefing with,”
Det. Long also testified that a presumptive gunshot residue test was performed on Lewis Cook and Thomas Riles. The test yielded a positive result on [fiLewis *1215 Cook and a negative result on Thomas Riles. Det. Long explained, however, that because this test was preliminary until additional testing can take place at the lab, it did not definitively indicate gunshot residue was present. He also stated that gunshot residue can potentially end up on a person’s body from being shot.
Det. Long explained that he learned at some point during his investigation that Jamal Phillips and Tony ■ Lacour were members of a gang called' “Get1 Money Boys” or “GMB.” Det. Steven Keller of the Intelligence Department of the NOPD assisted the Homicide Division in this regard. Det. Keller testified that he is responsible for identifying gangs' operating in Orleans Parish. Det. Keller stated that he was the lead detective on a RICO case involving a gang called the “110’ers” and learned that there was feud between the 110’ers and GMB. He testified that the feud had been going on since around 2008 or 2009, when Brandon Cotton was murdered. The 110’ers are associated with the Tenth and Eleventh Wards. GMB is associated with the Twelfth Ward. While conducting the RICO .investigation, Det. Keller discovered the identity of members of the GMB. Facebook and social media also demonstrated that Jamal Phillips and Tony Lacour were associated with GMB. Det. Keller testified on the State’s case in rebuttal that Lewis Cook was a member of the 110’ers and the motive for killing him was in retaliation of the murder of Brandon Cotton. Det. Keller also stated that several of the 110’ers were indicted for murder of GMB members.
At some point, the case was transferred to Det. Robert Chambers of the Cold Case Unit, Homicide Division. In 2013, Det. Chambers met with Cory Jackson, who positively identified the defendant from a photographic line up as one of the | (¡shooters. Corey Jackson also identified Jamal Phillips as the driver and Tony Lac-our as the other shooter. Corey Jackson reiterated these identifications at trial. He further explained that he did not identify the defendant when he first spoke with the detectives at the1 hospital because it was his plan at the time to retaliate against the' defendant and kill him. Corey Jackson stated that he decided to identify the defendant because he “couldn’t catch him;”
In 2014, Det. Chambers was notified by the District Attorney’s office that Paul Robinson had additional, information. . In his interview with Det. Chambers, Paul Robinson made a positive identification of the defendant in a photographic lineup.
Paul Robinson testified at trial that he came into contact with the District Attorney’s office because he was under investigation for being affiliated the 110’ers. Paul Robihson testified that he witnessed the February 14, 2011 shooting, but did not come forward initially for fear of retaliation. He identified the defendant as the shooter in the front passenger seat, firing a black Glock, and Tony Lacour as the shooter in the back seat, firing a black and silver Ruger. Jamal Phillips was identified as the driver.[3]
Both Corey Jackson and Paul Robinson were incarcerated and were under investigation for .being associated with the 110’ers when they identified the defendant. ■ Det. Keller, however, .testified that ultimately neither Paul Robinson nor Corey Jackson was identified as a member of the 110’ers gang.
The defendant testified that he was in the neighborhood of the 'River Garden Apartments with. Jamal Phillips on February 14, 2011, because he-was going to *1216 [ 7drop off a Valentine’s Day present to Caswand Winding. He never gave her the gift, however, because they got into an argument, and he went home. The defendant testified that he lived in the Ninth Ward and had no alliances with the Tenth, Eleventh, or Twelfth Wards. He stated that he was not a member of the gang GMB or Get Money Boys. However, the defendant conceded that he had GMB tattooed on his inner arm. He later admitted that he was part of a “rap group” named “GMB,” also known as “wekillinthem.com.” The defendant stated he had no problem with Lewis Cook or Corey Jackson, and that he had never killed anyone. He testified that he was friends with Jamal Phillips and Tony Lacour, but denied being in a gang with them. When presented with various photographs, the defendant denied that his hand gestures were gang signs.[4]
The defendant admitted that Jamal Phillips and Tony Lacour were killed because of Lewis Cook’s homicide. He also acknowledged that every member of the rap group GMB was deceased.
ERRORS PATENT:
A review of the record reveals no errors patent.
DISCUSSION:
On appeal, the defendant raises three assignments of error, asserting that the trial court erred in: 1) failing to grant the defendant’s motion for mistrial; 2) allowing the State to introduce evidence of four YouTube videos of the defendant rapping with his friends; and 3) failing to grant the defendant’s motion for new trial.

Assignment of Error No. 1: Motion for Mistrial

The record reflects that defense counsel moved for a mistrial prior to closing arguments due to circumstances surrounding a shooting that occurred outside of the courthouse during the defendant’s trial. That motion was denied. As indicated by the trial court on the record, defense counsel contemporaneously objected to the denial of the motion for mistrial.
Regarding the review of a motion for mistrial, this Court has stated:
Upon motion of a defendant a mistrial shall be ordered when prejudicial conduct in or outside the courtroom makes it “impossible for the defendant to obtain a fair trial.” La. C.Cr.P. art. 775. However, a “[mjistrial is an extreme remedy and, except for instances in which the mandatory mistrial provisions of La. C.Cr.P. art. 770 are applicable, should only be used when substantial prejudice to the defendant is shown.” State v. Burton, 09-0826, p. 10 (La.App. 4 Cir. 7/14/10), 43 So.3d 1073, 1080 (quoting State v. Castleberry, 98-1388, p. 22 (La.4/13/99), 758 So.2d 749, 768). A trial court has broad discretion in determining whether conduct is so prejudicial as to deprive an accused of a fair trial. State v. Leonard, 05-1382, p. 11 (La.6/16/06), 932 So.2d 660, 667. A trial court’s decision as to whether actual prejudice has occurred and whether a mistrial is warranted will not be overturned on appeal absent an abuse of that discretion. State v. Maxwell, 11-0564, p. 25 (La.App. 4 Cir. 12/21/11), 83 So.3d 113, 128.
State v. Henry, 11-1137, pp. 15-16 (La.App. 4 Cir. 10/24/12), 102 So.3d 1016, 1025,
In the present case, defense counsel requested a mistrial because of a shooting that occurred outside of the courthouse shortly prior to four jurors taking a smoke break during a court recess. At approximately 2:30 p.m. on February 27, 2015, a truck pulled up to the intersection of *1217 Broad and Gravier Streets, near the jury-lot. Someone inside the vehicle asked Sean Halligan, the IT director of the Criminal District Court, if the vehicle had a flat tire. As Halligan examined the tire, the passenger of the truck shot Halligan and sped off. When the truck reached |9the Broad Street overpass, the driver shot and killed the passenger and pushed the passenger’s body out of the vehicle. Just prior to the shooting, Halligan had been in the courtroom where the defendant was in trial. The transcript also indicates that the four jurors taking their smoke break were outside of the courthouse for three to four minutes when Deputy Favorite ushered them back into the courthouse after learning of the incident.
With regard to the motion for mistrial, the defendant argues that he did not receive a fair trial because the four jurors witnessed officers taping off the area and heard sirens of approaching emergency vehicles. The defendant notes that the jurors heard testimony that his alleged motivation for killing Lewis Cook was retaliation stemming from feuding rival gangs. The defendant argues that the jurors could have concluded that the shooting was connected to his case.
After the shooting incident, the trial court questioned the four jurors and Deputy Favorite individually in chambers and in the presence of all parties. The trial court asked each of the jurors what they observed/heard and whether the incident would impact their ability to serve as a juror or put either party at a disadvantage. None of the jurors witnessed the shooting or murder. Two of the jurors observed the aftermath of the shooting, which included emergency vehicles and police officers responding to the incident. The other two jurors testified that they did not see or hear anything. All four jurors indicated that the incident did not affect their ability to remain fair and impartial. The trial court noted that it was completely satisfied with the jurors’ answers. The trial court had the opportunity to observe the demeanor of each of the jurors while conducting the interviews and apparently found that the jurors were not prejudiced against the defendant and that the defendant would receive a fair trial.
hoWhile some of the jurors may have witnessed the emergency response to the incident, there is nothing in the record to suggest that they were aware the officers were in fact responding to a shooting. There is also no evidence that the jurors attributed the incident to gang violence or to the defendant. The defendant has not clearly shown jurors’ observation of the aftermath of the shooting incident prejudiced him to such a degree that a mistrial is warranted. As such, the trial court did not abuse its discretion in denying the motion for mistrial in this regard.
The defendant also argues that the trial court erred in denying his motion for mistrial based on the ex parte communications with District Attorney Cannizzaro, and the failure of the trial court to confiscate the jurors’ cellphones, all of which occurred in the aftermath of the shooting. We note that the trial transcript does not show whether the defendant specifically objected to the ex parte communications and to the jurors deliberating with their cell phones, as these discussions appear to have occurred off the record. Out of an abundance of caution, and because these issues are connected with the shooting incident, we will address these issues.
According to the defendant, trial was to recess on Friday afternoon following the shooting incident, but after an unrecorded ex parte conversation with Cannizzaro, the trial court changed its mind and proceeded with the trial. The defendant claims that after the colloquy *1218 with the jurors and the trial court’s suggestion that the matter be continued to Monday, the defendant and his counsel remained in chambers. When they walked out of chambers, defense counsel observed Cannizzaro speaking with the judge at the bench. Defense counsel allegedly heard Cannizzaro suggest to the court that the jurors’phones be taken away.
The trial transcript provides:
|„THE COURT:
All right, State, how do you feel about recessing until Monday morning?
MS. REED [The State]:
Judge, the State has no objection to us recessing until Monday morning. Prior to coming into chambers both the State and defense were at the bench when the Court stated that that was a possible solution just to let things sort of die down for the day.
'And, given the fact that Mr. Reed [defense counsel] stated he is asking for a mistrial, but I believe that it was just in anguish that he would not mind the alternative of coming back Monday. The State would certainly join with.that.
THE COURT:
Adi right. And just noting for the record, its 3:52 p.m. We have not even started closing, arguments in what has been a long trial. The Court would feel that to start closing arguments now would put both the State and the defense at a disadvantage.
-And certainly the jurors, you know, we have to see how they feel right now. The jurors may want to continue this thing tonight. I’m going to bring the jury out as a panel and query them as to how they look for Monday morning.
[BACK IN OPEN COURT]
THE COURT:
All right good afternoon, everyone. We are about to start closing arguments. ■ Asking you, we are at 4:00 o’clock, is everyone okay with proceeding with the trial?
All right, I’m getting all affirmative nods from all jurors. All jurors are seated and ready to proceed. All right, thank you so much.
Opening closing argument by the State.
The record reflects that the trial court acknowledged during the hearing on the motion,for new trial that, a conversation with Cannizzaro took place, but noted it was during a side-bar with defense counsel present, and not in chambers. The trial court indicated that it listened to arguments of both the District Attorney and defense counsel prior to determining that the jury would have a greater chance of [ t2receiving information about the shooting if they recessed oyer the weekend. It is reasonable for the trial court to find that the jurors would have more of an opportunity to research the facts surrounding the shooting and greater likelihood of being tainted if the trial was continued until Monday.
While Cannizzaro may have initially spoken with the trial court without the defense attorney, the record shows that the trial court was aware of the defendant’s concerns. Moreover, the trial judge’s comments on the record seem to indicate that her decision was also persuaded by the jurors’ willingness to proceed. In sum, we And that the defendant has failed to establish that the trial court’s communication with Cannizzaro and its decision to continue with closing arguments prejudiced the defendant such that it would entitle him to a mistrial.
Finally, in connection with the motion for mistrial, the defendant asserts that given the shooting incident, the trial court’s failure to take the cellphone and *1219 electronic devices from the jurors was substantially prejudicial to the defendant. The record reflects that at 3:18 p.m. on February 27, 2015, approximately forty minutes prior to jury deliberations, the New Orleans Advocate published an article on its affiliated website, which referenced the shooting, incident outside the courthouse, the defendant’s trial, and the fact that the IT employee had been in Section H prior to the shooting.
The defendant argues that although the trial court had previously admonished the jurors not to read about the case in-newspapers or conduct online research, the admonishment does not prohibit them from texting or receiving text messages from concerned friends and family that were aware of the shooting. The defendant claims that even if they did not actively research, phone apps of most media companies send mass push notifications alerting its users of any breaking |13news stories. The defendant also argues that the jurors were on an extended break during the time period between the publication, of the article and closing, and likely spent their idle time playing on their phones or electronic devices. The defendant further claims that to minimize prejudice, the trial court should have inquired as to whether any jurors — smoking or nonsmoking — had received information from friends/family or alerts from their mobile devices.
In State v. Berniard, 14-0841 (La.App. 4 Cir. 3/4/15), 163, So.3d 71, writ denied, 2015-0678 (La.2/26/16), 187 So.3d 468, an article about the defendant’s trial was posted on NOLA.com and the next day, the defense counsel had observed a juror with a newspaper and moved to individually voir dire the jurors. The trial court indicated that it had read the newspaper, and the article was not in there, and it denied the defense’s request to question jurors individually, but it stated it would question the jury as a group to determine whether any jurors had encountered news coverage about this trial. Id. at p. 25, 163 So.3d at 88. The trial court then asked the jurors collectively “whether anyone-watched the news on the previous night or saw anything about this case.” ' As a whble, the jurors replied in the negative. The trial court 'then specifically asked, “[njobody went to NOLA.com?” One juror responded to the trial court by asking, “[w]as something on there? ‘Did you see it?” The trial court replied that it was its job to watch for any news coverage of the trial, and it inquired again whether anyone had seen anything. No jurors responded, whereupon the trial court concluded its inquiry and resumed trial. Id.
In Bemiard, this Court found that a mistrial was not necessary because defendant made no motion for mistrial on the basis of the potential prejudice from the media coverage of and because there was no indication that any juror actually read or saw any media coverage of trial, noting that a mistrial “is not warranted 114absent a determination that the jurors were actually exposed to the publicity in question and were so impressed by it as to be incapable of rendering a fair and impartial verdict.” Id. at p. 26, 163 So.3d at 88 (citing State v. Russell, 416 So.2d 1283, 1290 (La.1982) and State v. Banks, 96-2227, pp. 3-4, (La.4/18/97), 692 So.2d 1051, 1053). The Berniard court further found no abuse, of discretion on the motion to individually voir dire given the absence of evidence that any juror read, saw, or encountered any media coverage of trial. Id. at p. 26, 163 So.3d at. 89; See also, Banks, 96-2227, p. 4, 692 So.2d at 1053-1054 (a mistrial was not required due to two jurors reading a newspaper article about the defendant where the jurors gave assurances that they could remain impartial).
*1220 Here, there is no evidence that the jurors read or were aware of the news article. While the defendant contends that media companies have apps to alert smart phone users of breaking news stories, there is no proof that jurors had downloaded such an application, nor is there anything in the record regarding how many jurors had smart phones capable of such functions. There is also nothing to suggest that the jurors received information about the shooting from friends or family. As the trial court noted at the hearing, the jury was “sequestered with deputies monitoring their conduct.” Presumably, if the deputies observed members of the juror discussing the news article or the shooting incident, they would have made the trial court aware.
Despite the defendant’s knowledge of the news being published, there is no indication that the defendant informed the trial court of the article or requested the trial court to question each juror individually to determine whether the jurors were aware of the media coverage. If the trial court did not know of the news article, | ]Sand the defendant did not alert the trial court about the article, the trial court would have had no responsibility to take curatives measures.
Furthermore, as the trial court explained during the hearing on the motion for new trial, and acknowledged by the defendant, the jurors were instructed multiple times during the proceedings not to watch local news or use the internet to research “about anything in the case.” On two of these occasions, before commencing trial for the day, the trial court asked the jury whether anyone received or sought out information about the case, and the jury responded in the negative. The record reflects that prior to the shooting incident, the trial court informed the jury specifically that the “media [was] in the building:” that it covers “stories in cases that we are doing here:” and the jury should not access any of that information. Further, it is undisputed that the trial court issued standard instructions to the jury directing them not to access media, internet, Google, or to research the case.
There is no evidence in the record that the jurors disobeyed any of the court’s instructions. Likewise, there is no evidence that the jurors were actually exposed to the publicity in question via the Advocate article, mobile news alerts, or text messages. Thus, the defendant has not demonstrated that he suffered injustice due to the shooting incident.
Moreover, contrary to the defendant’s assertions, we find that the return of a guilty verdict after thirty minutes of deliberation does not establish that the jurors were partial and influenced by the incident. Throughout the trial, the State presented ample evidence of the defendant’s guilt. Corey Jackson and Paul Robinson both identified the defendant as the individual in the front passenger seat who fired shots toward Lewis Cook and his friends. Further, Caswand Winding hsplaced the defendant and Jamal Phillips in the neighborhood minutes before the crime occurred. Additionally, testimony of Det. Keller established that the motive for killing Lewis Cook was gang related. Based on the foregoing, we find that the trial court did not abuse its discretion in denying defendant’s motion for a mistrial.

Assignment of Error Number 2: Introduction of You Tube Videos

In his second assignment of error, the defendant argues that the trial court erred in allowing the State to introduce four YouTube rap videos into evidence. The videos generally depict the defendant, and other individuals, rapping about GMB and killing people. The State offered the *1221 videos for impeachment purposes, to rebut the defendant’s testimony denying any involvement with GMB. The defendant testified at trial that he was a member of GMB the rap group, not GMB the gang. The defendant claims that the prejudicial effect of the YouTube videos outweighs the probative value.
The record reflects that defense counsel initially objected to playing the videos for the jury. However, after viewing the videos himself, defense counsel stated on the record that he had no objection. In fact,he specifically requested that the videos be played in their entirety.
Pursuant to La. C.Cr. P. art. 841, which provides that “[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence,” the defendant’s failure to object precludes review of this issue on appeal. Additionally, it is well settled that a new basis for objection cannot be raised for the first time on appeal. State v. Carter, 10-0614, pp. 27-28 (La.1/24/12), 84 So.3d 499, 521 (citing State v. Sims, 426 So.2d 148, 155 (La.1983)). Regardless, even if the issue had been properly preserved for review, this assignment of error is without merit.
117La. C.E. art. 403 states, “[although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.” Unfair prejudice, as used in La. C.E. art. 403, means that “the offered evidence has ‘an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.’ ” State v. Wilson, 12-1765, p. 21 (La.App. 4 Cir. 2/12/14), 138 So.3d 661, 676 (citing State v. Sanders, 12-0409, pp. 13-14, (La.App. 4 Cir. 11/14/12), 104 So.3d 619, 629-630, quoting Author’s Note (3) to La. C.E. art. 403, Handbook on Louisiana Evidence Law, Pugh, Force, Rault & Triche (2009)).
As this Court stated in Wilson, 12-1765, p. 22,138 So.3d at 677,
A trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect. State v. Thomas, 11-1219, pp. 21-22 (La.App. 4 Cir. 12/6/12), 106 So.3d 665, 679. Further, a trial court’s ruling admitting the evidence carries with it an implicit conclusion that the trial court found that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, as per La. C.E. art. 403. See State v. Magee, 11-0574, p. 49, n. 37 (La.9/28/12), 103 So.3d 285, 320 (“Although the district court did not specifically rule on the admissibility of the statements under La. C.E. art. 403 (perhaps because it was not asked to), the court admitted the statements, implicitly finding that their probative value substantially outweighed the danger of ‘unfair prejudice, confusion of the issues, or misleading the jury.’ La. C.E. art. 403.”).
The defendant argues that the videos are not relevant in establishing his guilt because they do not reference Lewis Cook or any of the other victims shot on February 14, 2011. The defendant further claims the videos and lyrics are a form of artistic expression, and by allowing the jurors to view the videos the jurors were misled into believing that the defendant had committed the crimes he rapped about and prejudiced the defendant.
hsWhile the videos may not be relevant to demonstrate that the defendant is responsible for the instant offense, they are *1222 relevant in establishing that the defendant was in fact affiliated with a group known as GMB or Get Money Boys. As such, the videos had probative value and were admissible to establish the defendant’s association with GMB and refute his earlier testimony to the contrary: Moreover, as discussed previously, there was ample evidence demonstrating the defendant’s involvement in-the drive by shooting, and thus the introduction of the videos likely had little prejudicial effect on the jury. Accordingly, the trial court did not abuse its discretion in determining that the probative value of the videos confirming the defendant’s GMB membership outweighed any prejudicial effect. This assignment of error has no merit.

Assignment of Error No. 3: Motion for New Trial

The defendant filed a motion for new trial asserting that: 1) the trial court erred in denying the motion for mistrial and proceeding with the trial after the shooting incident; and 2) the State made impermissible and inflammatory remarks in its closing argument.
“A motion for new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case, the motion shall be denied, no matter upon what allegation it is grounded.” La. C.Cr.P. art. 851. “A trial court’s ruling on a motion for a new trial will not be disturbed on appeal absent a clear showing of an abuse of discretion.” State v. Gordon, 13-0495, p. 21 (La.App. 4 Cir. 7/16/14), 146 So.3d 758, 771 (citing State v. Cox, 10-2072, p. 1 (La.11/19/10), 48 So.3d 275).
With respect to the trial court’s denial of his motion for new trial, the defendant asserts that injustice was brought upon him as a result of the shooting | ^incident that occurred just hours before the jurors deliberated. This is the same argument asserted by the defendant in the denial of his motion for mistrial. For the reasons set forth above in reference to the trial court’s denial of the defendant’s motion for mistrial, we find no error in the denial of the motion for new trial in relation to the shooting incident.
The defendant further claims that a new trial should have béen granted because ' the prosecution improperly referenced his pre-trial incarceration during closing arguments. The comment to which'the defendant refers occurred during the State’s rebuttal, wherein the State suggested that the defendant would have been killed from gang violence if he had not been in jail ahd “been on the streets.”
The defendant notes that each day prior to trial, he changed out of his prison jumpsuit into' civilian clothing to protect his right to the presumption of innocence and to insulate the jurors from knowledge of his incarceration. The defendant claims the prosecution’s comments were made for the sole purpose of tainting the jurors and prejudicing his right to a fair trial.
The general rules governing closing arguments are set forth in La. C.Cr.P. art. 774, as follows: “The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The state’s rebuttal shall be confined to answering the argument of the defendant.”
In assessing whether a prosecutor’s closing argument goes beyond the boundaries of Article 774, this Court has noted:
A prosecutor should refrain ' from making personal attacks on defense counsel and strategy. State v. Celestine, 12-1541, p. 10 (La.App. 4 Cir. 12/18/13), 131 So.3d 947, 954, writ denied, 14-0158 *1223 (La.8/25/14), 147 So.3d 699. Closing argument shall not appeal to prejudice. State v. Simms, 13-0676, p. 18 (La.App. 4 Cir. 6/18/14), 143 So.3d 1258, 1269, writ denied, 14-1542 (La.2/27/15), 160 So.3d 963.
However, prosecutors have wide latitude in their closing argument. State v. Haynes, 13-0323, p. 12 (La.App. 4 Cir. 5/7/14), 144 So.3d 1083, 1090. A trial court has broad discretion in controlling the scope of closing arguments. State v. Webb, 13-0146, p. 26-27 (La.App. 4 Cir. 1/30/14), 133 So.3d 258, 275-276, writ denied, 14-0436 (La.10/3/14), 149 So.3d 793, cert. denied sub nom., Webb v. Louisiana, — U.S. —, 135 S.Ct. 1719, 191 L.Ed.2d 689 (2015). Even where a prosecutor exceeds the bounds of proper argument, a reviewing court will not reverse a conviction unless thoroughly convinced that the argument influenced the jury and contributed to the verdict. State v. Caliste, 12-0533, p. 17 (La.App. 4 Cir. 9/4/13), 125 So.3d 8, 18. Further, common sense and logic suggests that in this respect the reviewing court must be thoroughly convinced that the improper argument influenced the jury and contributed to it rendering a verdict based, at least in part, on prejudice or some reason other than the weight of the evidence presented. Credit should be accorded to the good sense and fair-mindedness of the jurors who have heard the evidence. State v. Bailey, 12-1662, p. 8 (La.App. 4 Cir. 10/23/13), 126 So.3d 702, 707. (footnote omitted).
State v. Jones, 15-0123, pp. 44-45 (La. App 4 Cir. 12/2/15), 182 So.3d 251, 279-280.
In the present case, while defense counsel objected to certain remarks made during the State’s closing argument, the record does not reflect that an objection was made to the State’s remarks regarding the defendant’s incarceration. The issue was raised, however, in the defendant’s post-verdict motion for new trial.
Whether a motion for new trial preserves a particular issue for appellate review is not settled law. See State v. Sykes, 03-397, p. 23 (La.App. 3 Cir. 10/8/03), 857 So.2d 638, 653; State v. Hernandez, 14-863, p. 19 (La.App. 5 Cir. 9/23/15), 177 So.3d 342, 355, (reh’g denied 10/20/15).
Although the circuits are split as to whether a motion for new trial preserves an issue for review, this Court found in State v. Ott, 10-1307, (La.App. 4 Cir. 1/5/12), 80 So.3d 1280 that a motion for new trial was insufficient to preserve |^review of the' prosecution’s comments during closing argument when the defendant failed to contemporaneously object. In Ott, we stated, in part:
[T]he ’ defendant' asserts that certain statements made during thé State’s closing arguments'were untrue and were prejudicial to the defendant. Moré specifically, the defendant complains that the district attorney violated his due process right to a fair trial during the State’s rebuttal closing argument when he falsely represented to the jury that the defendant’s uninformed knowledge of' certain investigative facts proved his guilt. The defendant concedes that “[djefense counsel did not immediately object to this argument,” but nonetheless asserts that this issue was preserved by its inclusion as a basis for his post-yerdict motion for new trial, and asks this Court to consider the merits thereof. '
⅜ * * ,
A defendant cannot-.avail himself of an alleged error unless he made a contém-poraneous.objection at the time of the error. La. C.Cr.P. art. 841(A); State v. Cuccia, 2005-0807, p. 34 (La.App. 4 Cir. 3/15/06), 933 So.2d 134. Not only , does an objection have to be made, but La. C.Cr;P. art 841(A) requires that a de *1224 fendant make known the grounds for his objection, and he is limited on appeal to those ground articulated at trial. State v. Brooks, 98-0698, p. 9 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 819. Objections to remarks of the district attorney in closing argument must be made at that time and not after conviction in a motion for a new trial. State v. Batiste, 318 So.2d 27, 36 (La.1976). By not objecting, defendant has failed to preserve this issue for review.
Ott, 10-1307, pp. 12-13, 80 So.3d at 1287-1288 (footnote omitted).
Nevertheless, assuming that the defendant properly objected to the prosecution’s remarks and preserved the issue for review, the Louisiana Supreme Court in State v. Johnson, 343 So.2d 155, 161 (La.1977) found that a reference to defendant’s incarceration did not warrant a mistrial. During voir dire, the trial judge in Johnson asked a prospective juror, “Have you discussed the matter of this man being in jail with anyone?” and “Do you know what he’s in jail for?” The trial judge denied the defense’s request for a mistrial based upon these comments, but l22admonished the jury to disregard the references to the defendant’s incarceration. On appeal, the Court rejected the defendant’s argument that “the same principles which dictate that an accused not be tried in prison uniform also prohibit reference to his imprisonment.” Johnson, 343 So.2d at 161. The Johnson Court stated:
An accused has the right to dress in civilian clothing at trial because prison attire might unduly connote guilt. The remarks complained of in the instant case merely drew attention to a prominent fact of the trial-that defendant had been formally accused of the crime for which he was being tried. Although the fact of accusation may be suggestive of guilt to some jurors, as the State argues in brief, it is an incident of trial from which the jurors simply cannot be insulated. The court’s admonition to the jury in this case, that it should not be prejudiced by the fact of defendant’s incarceration, was the most that could be done to counteract any latent bias.

Id.

Here, similar to Johnson, the prosecution’s remarks appear to refer to the defendant’s imprisonment in connection with the charged offense. However, because the defendant did not object to the State’s comments or move for mistrial, unlike in Johnson, no curative action of the trial court appears to have been required. Moreover, the record reflects that the defendant himself acknowledged on cross-examination that he was incarcerated for the instant offense.
Even if this Court found the comments regarding his incarceration improper, the defendant has not demonstrated that these statements influenced the jury or contributed to the verdict. Taking into account the testimony of all the witnesses and the evidence introduced at trial, and giving credit to good sense and fair mindedness of the jurors who heard the arguments and evidence, it unlikely that the prosecution’s comments about the defendant’s incarceration influenced the jury to return a guilty verdict for the defendant. Therefore, the defendant’s argument l^that an injustice was brought upon him as a result of the State’s comments lacks merit. Accordingly, we find no merit in the defendant’s third and final assignment of error.
CONCLUSION:
For the foregoing reasons, we affirm the defendant’s sentence and conviction.
CONVICTION AND SENTENCE AFFIRMED
LOBRANO, J., concurs in the result.

. When this matter came for trial, both Tony Lacour' and Jamal Phillips were deceased.

. At trial, Caswand Winding testified that she felt coerced by the detectives to make a statement on February 17, 2011, but later stated that everything recorded on the statement was the truth.

. The defendant testified that he had never heard of Paul Robinson.

. Det. Keller testified, however, that two fingers up represents the Twelfth Ward.